**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 25, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

---

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

DENNIS EUGENE RODEBAUGH, d/b/a
D&S Guide and Outfitter,

    Defendant - Appellant.

No. 13-1081

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. No. 1:10-CR-00444-CMA-1)**

---

Jeffrey R. Edelman, Jeffrey R. Edelman, P.C., Parker, Colorado, appearing for Appellant.

Allen M. Brabender (John C. Cruden, Assistant Attorney General, J. Ronald Sutcliffe and Mark T. Romley, with him on the brief), Environment & Natural Resources Division, United States Department of Justice, Washington, D.C., appearing for Appellee.

---

Before **MATHESON**, **BACHARACH**, and **MORITZ**, Circuit Judges.

---

**PER CURIAM**.

---

In this appeal, the court affirms on all issues. This disposition is addressed in two opinions: one by Judge Matheson and one by Judge Bacharach.

Parts I and II(A)-(D) of Judge Matheson's opinion represent the unanimous opinion of the court. There, the court affirms the conviction and prison sentence, rejecting Mr. Dennis Rodebaugh's challenges to the district court's denial of the motion to suppress, the validity of the underlying Colorado regulations, the sufficiency of the evidence to support the conviction on each count, and the application of enhancements to the base offense level under the U.S. Sentencing Guidelines.

Judge Bacharach's opinion is joined by Judge Moritz and represents the opinion of the court with respect to Mr. Rodebaugh's challenges to an occupational restriction among the terms of supervised release. On these issues, Judge Matheson dissents, as discussed in Part II(E) of his opinion.

Finally, we deny Mr. Rodebaugh's "First Motion to Supplement the Record on Appeal."

---

**MATHESON**, Circuit Judge.

---

Dennis E. Rodebaugh ran D&S Guide and Outfitters ("D&S"), an outfitting and guide service in Meeker, Colorado.[1] Through D&S, Mr. Rodebaugh took mostly out-of-state clients on elk and deer hunts in the White River National Forest near Meeker, where they waited in tree stands for elk and deer to approach before shooting them.[2] To attract the elk and deer, Mr. Rodebaugh spread salt around the base of the tree stands. Colorado

---

[1] An outfitter sells clothing, equipment, and services, especially for outdoor activities. A guide service leads paying clients in outdoor activities, such as hunting.

[2] Tree stands are platforms secured in trees to elevate the hunter to a better vantage point.

law prohibits this practice of "baiting."  And selling wildlife taken in violation of state law is a federal crime under the Lacey Act.

After an extensive investigation, Mr. Rodebaugh was indicted for several Lacey Act violations.  A jury found him guilty on six counts.  The district court sentenced him to 41 months in prison and three years of supervised release.  He appeals, raising various trial and sentencing issues.  We exercise jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

## I.  **BACKGROUND**

### A.  *Legal Background*

Colorado law makes it unlawful for any person to hunt, take, or possess any wildlife except as authorized by statute or regulation.  Colo. Rev. Stat. § 33-6-109(1).  Elk and deer, alive or dead, are "wildlife" in Colorado.  *Id.* § 33-1-102(51).

Colorado law prohibits the use of baiting.  2 Colo. Code Regs. § 406-0:004(A) ("[T]he use of baits and other aids in hunting or taking big game, small game and furbearers is prohibited.").  "Baiting" is the "placing, exposing, depositing, distributing, or scattering of any salt, mineral, grain, or other feed so as to constitute a lure, attraction or enticement for wildlife."  *Id.* § 406-0:000(A)(4).

The Lacey Act makes it a federal crime to sell in interstate commerce wildlife that is taken in violation of state law:

> It is unlawful for any person—
> . . .
> (2) to import, export, transport, sell, receive, acquire, or purchase in interstate or foreign commerce—

(A) any fish or wildlife taken, possessed, transported, or sold in violation of any law or regulation of any State or in violation of any foreign law . . . .

16 U.S.C. § 3372(a). The sale of wildlife includes the sale of "guiding, outfitting, or other services . . . for the illegal taking, acquiring, receiving, transporting, or possessing of fish or wildlife." *Id.* § 3372(c)(1).

B. *Factual History*

1. **Mr. Rodebaugh's Business and Baiting Activities**

In 1987, Mr. Rodebaugh purchased D&S from Jack Peters. Through D&S, Mr. Rodebaugh led out-of-state hunting clients on elk and deer hunts in the White River National Forest.

Mr. Rodebaugh offered his clients "bugle" hunts and "tree-stand" hunts. In bugle hunts, hunters called for elk with a bugle. When the hunter was close enough to an elk, the hunter could shoot. This kind of hunt involved a lot of moving around. Mr. Rodebaugh could take, at most, only two to three people on these hunts.

In tree-stand hunts, the hunters remained stationary, waiting for a target to come into range. Mr. Rodebaugh's tree stands had nicknames such as "Big Ridge," "Mike's," "Cathy's," "Upper Duck," "Lower Duck," and "Paul's." Most of the stands were erected near wallows, where male deer and elk urinate and roll around to attract does and cows during mating season. On most trips, Mr. Rodebaugh would take a few hunters out on bugle hunts and leave the other hunters in the tree stands. The tree stands allowed Mr. Rodebaugh to take more hunters and make more money on each trip.

Mr. Rodebaugh's hunters enjoyed "very high success rates, specifically on elk." ROA, Vol. III at 530. The "shot percentage"—the opportunity to take a shot at an animal—was in "the high 80s or low 90[s]." *Id.* at 1376. To accomplish this success, Mr. Rodebaugh baited using sheep salt, a mineral supplement commonly used by sheep ranchers. Mr. Rodebaugh bought the salt at Snyder & Counts feed store and placed it on the ground around the stands. He testified he used the salt because he knew animals would come for it. He said animals needed the minerals from the salt to grow horns and provide for their offspring. He placed the salt under logs and rocks so the animals would not use it too quickly and so it would have time to soak into the soil, meaning it would be available for longer periods of time.

## 2. **The Investigation and Confession**

In August 2005, a landowner informed a state wildlife officer that he suspected Mr. Rodebaugh was baiting the tree stands to attract elk and deer for his clients. An extensive state and federal investigation of Mr. Rodebaugh's activities ensued. Law enforcement agents hid cameras near tree stands and worked undercover as hunting clients. Eventually, investigators searched Mr. Rodebaugh's home, which uncovered evidence, including receipts for salt from Snyder & Counts.

During the search, law enforcement agents interviewed Mr. Rodebaugh. Initially, he denied placing salt near the stands, telling the investigators that people might think he salted his stands because some of them were located over "old cowboy salt licks." *Id.* at 877-78. But when the agents said they had a photograph of him placing salt, Mr. Rodebaugh admitted to baiting, saying he learned the practice from Mr. Peters. He baited

- 5 -

every year as early as April, but never past August because "he was afraid that the hunters would be able to see the salt, and he didn't want to get caught." *Id.* at 881. He admitted to purchasing the salt from Snyder & Counts. He knew baiting was illegal and that animals were attracted to the stands as a result of his illegal activities: "What I did is absolutely not right." *Id.* at 880-81.

## C. *Procedural History*

A federal grand jury indicted Mr. Rodebaugh with one count of conspiracy to violate the Lacey Act (Count 1) and nine counts of violating the Lacey Act for the "[i]nterstate sale of outfitting and guiding services . . . to [certain clients] for the unlawful taking of [certain elk and deer]" between January 2005 and September 2007 (Counts 2-10). ROA, Vol. I at 31-32.[3]

On May 11, 2011, Mr. Rodebaugh moved to suppress his confession, arguing in part that his confession was involuntary, and moved to dismiss the indictment, arguing the Colorado regulations prohibiting baiting were unconstitutionally vague. On June 15, 2012, the district court held a hearing on the motion to suppress, at which Mr. Rodebaugh testified. At the end of the hearing, the court denied the motion. On August 22, 2012, the district court denied the motion to dismiss the indictment without prejudice but granted leave to raise the vagueness issue at trial.

A multi-day trial commenced on September 10, 2012. During trial, Mr. Rodebaugh raised his vagueness challenge again, which the district court rejected. The

---

[3] Each of the nine counts for violating the Lacey Act dealt with certain deer and elk shot by particular hunting clients.

- 6 -

jury found Mr. Rodebaugh guilty of six Lacey Act violations (Counts 2-5, 8-9).  It acquitted him of the conspiracy charge (Count 1) and Counts 7 and 10.[4]

Before sentencing, Mr. Rodebaugh filed written objections to the Probation Office's presentence report ("PSR"), which recommended a special condition restricting Mr. Rodebaugh's hunting and fishing activities.  At the sentencing hearing on February 13, 2013, the district court applied three enhancements to the base offense level:  a six-level enhancement because the value of the unlawfully-taken wildlife was greater than $30,000; a two-level enhancement because Mr. Rodebaugh's conduct created a significant risk of disease transmission among the wildlife; and a two-level enhancement for obstruction of justice.  These enhancements, along with several other enhancements not at issue in this appeal, brought Mr. Rodebaugh's total offense level to 22, with a resultant Guidelines range of 41-51 months.

The district court sentenced Mr. Rodebaugh to 41 months in prison and three years of supervised release.  It imposed the following supervised release special condition: "The defendant shall not be allowed to hunt and/or kill any wildlife or fish.  He may not guide or outfit hunters in any state and may not hunt or fish, or accompany anyone hunting or fishing anywhere in the United States."  ROA, Vol. II at 764.

## II.  **DISCUSSION**

The briefs are organized around five issues, several of which encompass sub-issues.  We consider whether:  (A) the district court erred in denying the motion to suppress because the confession was involuntary and the court made Mr. Rodebaugh

---

[4] The Government had dismissed Count 6 before trial.

present first at the suppression hearing, (B) the Colorado regulations are void for vagueness, (C) the evidence is sufficient to sustain each conviction, (D) the court erred in applying three enhancements to the base offense level when calculating the Guidelines range, and (E) the district court erred in its imposition of the supervised release special condition.

### A. *Motion to Suppress*

Mr. Rodebaugh argues the district court erred twice when it denied his motion to suppress his confession.[5] First, he argues his confession was involuntary. Second, he seems to contend the district court erred by making him present first at the suppression hearing. We reject both arguments.

### 1. **Voluntariness of the Confession[6]**

#### a. *Legal background*

Mr. Rodebaugh argues his confession was involuntary. In a due process voluntariness analysis, we must decide "whether the confession is the product of an essentially free and unconstrained choice by its maker. If so, it may be used against him. If instead his will has been overborne and his capacity for self-determination critically

---

[5] Mr. Rodebaugh also argues the district court denied his motion to suppress "without making complete and adequate findings." Aplt. Br. at 21. This argument lacks merit because the district court made sufficient findings, as is readily apparent in the record. We decline to address this argument further.

[6] Mr. Rodebaugh was not given *Miranda* warnings. *See generally Miranda v. Arizona*, 384 U.S. 436 (1966). Before the district court, Mr. Rodebaugh made both a *Miranda* argument and a due process voluntariness argument. *See Dickerson v. United States*, 530 U.S. 428, 433-35 (2000) (distinguishing a *Miranda* argument from a due process voluntariness argument). The district court rejected his *Miranda* argument, determining Mr. Rodebaugh was not in custody. On appeal, Mr. Rodebaugh raises only due process voluntariness, and we limit our discussion to that issue.

impaired, the use of his confession offends due process." *United States v. Pettigrew*, 468 F.3d 626, 637 (10th Cir. 2006) (quotations and citation omitted).

We consider whether a confession was made voluntarily based on the totality of circumstances. *Id.* "Relevant circumstances embrace both the characteristics of the accused and the details of the interrogation." *United States v. Lopez*, 437 F.3d 1059, 1063 (10th Cir. 2006) (quotations omitted). "Such factors include (1) the age, intelligence, and education of the defendant; (2) the length of detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subject to physical punishment." *Id.* at 1063-64.

"The Supreme Court has held coercive police activity to be a necessary predicate to the finding that a confession is not voluntary." *Smith v. Mullin*, 379 F.3d 919, 934 (10th Cir. 2004) (quotations omitted). The police cannot obtain a confession through "acts, threats, or promises" that cause the defendant's will to be overborne. *United States v. Toles*, 297 F.3d 959, 965 (10th Cir. 2002).

b. *Standard of Review*

"When a party challenges a district court's ruling on a motion to suppress a confession, we review its conclusions of law de novo and its factual findings for clear error." *Pettigrew*, 468 F.3d at 633 (10th Cir. 2006). "We consider the evidence in the light most favorable to the district court's determination." *Id*. So "when reviewing the denial of a motion to suppress, an appellate court . . . must consider the evidence adduced at the suppression hearing and the trial in the light most favorable to the Government."

*United States v. Rios*, 611 F.2d 1335, 1344 (10th Cir. 1979) (citation and footnote omitted).

"Consideration of witness credibility, the weight given to evidence, and reasonable inferences drawn from evidence are within the district court's province as the fact-finder." *United States v. Andrus*, 483 F.3d 711, 716 (10th Cir. 2007). But "it is the Government's burden to show, by a preponderance of the evidence, that a confession was voluntary." *Pettigrew*. 468 F.3d at 633.

c. *Analysis*

Considering the evidence in the light most favorable to the Government, we determine that under the totality of the circumstances—including Mr. Rodebaugh's characteristics and the details of the interrogation—the confession was voluntary. The record does not demonstrate his will was overborne.

i. Personal characteristics

Mr. Rodebaugh argues several personal characteristics indicate his confession was involuntary. In particular, he contends his "ability to exercise clear and rational judgment was compromised" during the interview due to sleep deprivation. Aplt. Br. at 27. He notes he had slept for only about three hours over the two days before the interview. He states he asked the law enforcement agents if the interview could take place after a nap, but they refused. Mr. Rodebaugh's daughter-in-law testified that, after the interview, "his mental state was distraught; extremely worn out" due to sleep deprivation. ROA, Vol. III at 105. Mr. Rodebaugh's arguments are not persuasive.

The district court found Mr. Rodebaugh's lack of sleep was the "normal course" for him. *Id.* at 320. It noted that another guide, a witness at trial, testified that Mr. Rodebaugh slept typically only a couple hours each night and some nights not at all. The witness noted that although Mr. Rodebaugh was "worn down" on the day of the interview, this "wouldn't have been any different from any other season." *Id.* at 312. The court also found Mr. Rodebaugh did not exhibit physical signs of sleep deprivation, like nodding off. He was coherent throughout the interview. In fact, he drove himself to the interview and back.

The record also contains no evidence to indicate Mr. Rodebaugh "was unusually susceptible to coercion because of age, lack of education, or intelligence." *Lopez*, 437 F.3d at 1065 (quotations omitted). As the district court said, "At the time of his confession, the defendant was a 69-year-old man who was operating a successful guiding business." ROA, Vol. III at 319.[7] Mr. Rodebaugh graduated from high school and completed some trade school. The district court noted he was healthy and not taking any medications.

Mr. Rodebaugh fails to demonstrate the district court's findings on his characteristics, which weigh in favor of voluntariness, were clearly erroneous.

### ii. Details of the interrogation

The details of the interrogation further demonstrate Mr. Rodebaugh's will was not overborne. The agents asked if he would be willing to talk to them, and he said yes. Aside from the first five to ten minutes when three officers were present, only two

---

[7] At the time of the confession, Mr. Rodebaugh was actually 66 years old.

- 11 -

officers were present for the three to four hour interview, and neither displayed a weapon or had physical contact with Mr. Rodebaugh. The interview took place outdoors, at a picnic table, rather than in a police station.

Mr. Rodebaugh contends he was not informed that he could cease the interview for rest, water, or food. But the agents actually offered him water. And they told him at least twice he was free to leave and that he did not have to talk to them. He was never told he was not free to leave. The agents also told him he was not under arrest. The district court found Mr. Rodebaugh at no time attempted to leave, implicitly discrediting his testimony to the contrary.

Mr. Rodebaugh also argues he "was tricked into coming to speak about two complaining hunters and promised a short meeting. The short meeting turned into a three (3) hour interrogation." Aplt. Br. at 27. But Mr. Rodebaugh was not tricked or deceived, *see Clanton v. Cooper*, 129 F.3d 1147, 1158 (10th Cir. 1997), because the agents sincerely sought to discuss the hunters' complaint with Mr. Rodebaugh. Moreover, the interview was not unduly long, especially in light of the agents' nonaggressive questioning. *See United States v. Harris*, 956 F.2d 279, 1992 WL 33210, at *6 (10th Cir. 1992) (unpublished) (noting one three-hour interrogation and then a second two- to three-hour interrogation did not render the confession involuntary).[8]

---

[8] Although not precedential, we find the reasoning of this unpublished opinion instructive. *See* 10th Cir. R. 32.1 ("Unpublished decisions are not precedential, but may be cited for their persuasive value."); *see also* Fed. R. App. P. 32.1.

One matter gives us pause. At the suppression hearing, Mr. Rodebaugh testified that an agent told him, before he admitted to baiting, "If you work with us, we'll go easy on you, otherwise we are going to take your house and all of your property away from you." ROA, Vol. III at 136, 313. The Government has not contested the agent made this statement. Mr. Rodebaugh argues he was "intimidated with the loss of his house and the apparent use of force to prevent the defendant from leaving." Aplt. Br. at 29.[9] The district court ruled:

> Despite defendant's allegations to the contrary, it did not appear that the agents used language or a tone of voice that would have implied to a reasonable person that compliance with their request would be compelled. Considering the totality of the circumstances, a reasonable person in defendant's position would have felt free to have ended the questioning.

ROA Vol. III at 317.

The district court's ruling can be read two ways: (1) that the statement was not a threat, or (2) although a threat was made, it did not overbear Mr. Rodebaugh's will. If no threat was made, we can easily affirm. But even if the agent's "take your house" statement was a threat, we still affirm under the totality of the circumstances.

The existence of a threat is not dispositive—all of the circumstances must be examined. *See United States v. Jacques*, 744 F.3d 804, 809-11 (1st Cir. 2014) (holding a threat of harsher punishment if the defendant failed to cooperate did not render the confession involuntary based on all the evidence). Mr. Rodebaugh does not show on

---

[9] This excerpt is Mr. Rodebaugh's only argument on this point, though he briefly mentions the threat two other times as a factual matter. Although the briefing is minimal, *see Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 679 (10th Cir. 1998) ("Arguments inadequately briefed in the opening brief are waived."), we proceed to the merits.

appeal how the alleged threat had a "meaningful impact" on his conduct. *Id.* at 811. He

was not in custody or under arrest, was told at least twice that he was free to leave, was

informed he did not have to speak to the agents, and did not attempt to leave. "In the

absence of other coercive pressures," the agent's threat did not make Mr. Rodebaugh's

confession involuntary. *See United States v. Jenkins*, 214 F. App'x 678, 680 (9th Cir.

2006) (unpublished).[10] We note an agent testified that Mr. Rodebaugh admitted to

baiting immediately after the agents told him they had a photograph of him placing salt.

Mr. Rodebaugh admitted that he made the confession after hearing about the photograph

*and* hearing the threat. The evidence, considered in the light most favorable to the

Government, indicates the existence of the photographs most likely prompted the

confession, not the agent's troublesome statement.

Further, as explained above, Mr. Rodebaugh's characteristics did not make him

particularly susceptible to the pressure. *See United States v. Meirovitz*, 918 F.2d 1376,

1379 (8th Cir. 1990) (finding a confession voluntary where agents offered "threats of a

long prison sentence if [the defendant] failed to cooperate" but there was no evidence that

showed the defendant was "especially susceptible to police pressure"). He cooperated

---

[10] Mr. Rodebaugh alleges in his brief that the agent pointed a finger at him and used a raised and intimidating voice to threaten him with the loss of his home. The district court disagreed, noting "it did not appear that the agents used language or a tone of voice that would have implied to a reasonable person that compliance with their request would be compelled." ROA, Vol. III at 317. Indeed, Mr. Rodebaugh actually testified that the agent did *not* raise his voice. Rather, the agent made the comment in an "emphatic" and "demanding" tone. We cannot find evidence in the record for the assertion the officer pointed his finger at Mr. Rodebaugh.

with agents in a nonaggressive interview and even brought the agents to his home to show them where he kept the salt.

As for the statement "If you work with us, we'll go easy on you," it was "vague and non-committal," *Lopez*, 437 F.3d at 1065 (quotations omitted), and cannot be understood to mean Mr. Rodebaugh was "so gripped by the hope of leniency that he did not or could not freely and rationally choose among the available courses of action." *Clanton*, 129 F.3d at 1159 (quoting *United States v. Garot*, 801 F.2d 1241, 1245 (10th Cir.1986)); *see United States v. Hernandez*, 93 F.3d 1493, 1503 (10th Cir. 1996) (holding that a promise of favorable treatment if the appellant cooperated did not make the confession involuntary); *United States v. Rutledge*, 900 F.2d 1127, 1128, 1130 (7th Cir. 1990) (determining that an agent's statement that "all cooperation is helpful" did not lead to an involuntary confession). At most, this statement is a "limited assurance" that we have held to be a permissible interrogation tactic. *See United States v. Lewis*, 24 F.3d 79, 82 (10th Cir. 1994).

Mindful we must consider the evidence in the light most favorable to the district court's determination, the agent's statement, when considered with Mr. Rodebaugh's personal characteristics and the rest of the interrogation's circumstances, is concerning but did not amount to the kind of "coercive police activity" that would render his confession involuntary. *See Mullin*, 379 F.3d at 934.[11]

---

[11] Mr. Rodebaugh also contends he was never informed of his right to an attorney. But "[i]t is well established that police officers are not required to administer *Miranda* warnings to everyone whom they question. Instead, the warnings mandated by *Miranda* apply only to statements obtained from an individual who is subjected to custodial police

2.  **Order of Presentation**

Mr. Rodebaugh seems to contend the district court also erred by making him present first at the suppression hearing.  We review a court's decision on the presentation of evidence under an abuse-of-discretion standard.  *See Thweatt v. Ontko*, 814 F.2d 1466, 1470 (10th Cir. 1987).  The Government argues this issue should be reviewed for plain error because Mr. Rodebaugh failed to make a contemporaneous objection to the order of presentation.  We need not resolve whether plain error review applies because we conclude there was no error.

A district court has "considerable discretion" in running its courtroom.  *United States v. Banks*, 761 F.3d 1163, 1193 (10th Cir. 2014).  Courts must exercise control "over the mode and order of examining witnesses and presenting evidence."  Fed. R. Evid. 611(a); *see United States v. Janati*, 374 F.3d 263, 273 (4th Cir. 2004) ("[W]e have held, among other things, that district courts have wide-ranging control over management of their dockets, the courtroom procedures, and the admission of evidence."); *Ontko*, 814 F.2d at 1470 ("A trial court necessarily possesses considerable discretion in determining the conduct of a trial, including the orderly presentation of evidence.").  The trial court's discretionary decisions relating to the orderly presentation of evidence "will not be disturbed absent a manifest injustice to the parties."  *Ontko*, 814 F.2d at 1470.

---

interrogation."  *United States v. Erving L.*, 147 F.3d 1240, 1247 (10th Cir. 1998) (quotations and citations omitted).  Mr. Rodebaugh makes no argument on appeal that he was subject to custodial police interrogation and therefore cannot prevail on this argument.

Mr. Rodebaugh has failed to demonstrate how presenting first prejudiced him in any way, much less resulted in any manifest injustice. Contrary to what Mr. Rodebaugh seems to contend, there is nothing in the record to indicate that the district court's decision to make Mr. Rodebaugh present first shifted the burden of proof from the Government to him. After Mr. Rodebaugh presented his evidence on the motion to suppress, the Government called its own witnesses. By making Mr. Rodebaugh present first (seemingly because he had filed the motion), the district court was simply exercising its discretion to run its courtroom as it saw fit.[12]

\* \* \* \*

The district court did not err in determining Mr. Rodebaugh's confession was voluntary or in making Mr. Rodebaugh present first at the hearing on his motion to suppress. Thus, we affirm on this first issue.

---

[12] Mr. Rodebaugh also argues the district court erred by "not advising [him] of the consequences of testifying." Aplt. Br. at 19. He notes he was not advised that any statement could be used against him at trial or in another proceeding or that he could remain silent. He failed to raise this argument below and does not argue plain error on appeal, so we deem this argument waived. *See Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1130-31 (10th Cir. 2011).

Mr. Rodebaugh also, relatedly, seems to argue he was forced to testify. This argument is also waived, for the reasons given above. But we note that although the court told Mr. Rodebaugh to present before the Government, it did not force Mr. Rodebaugh to testify. Mr. Rodebaugh voluntarily called his witnesses and testified himself. And just because Mr. Rodebaugh chose to testify *before* the Government presented its case does not mean the court erred. To testify beforehand was a strategic decision that he made with his attorney. *See Banks*, 761 F.3d at 1192-93 (rejecting the defendant's argument that the court compelled him to testify where he probably made a strategic decision to do so and could have complied with the court order by calling another witness).

## B.	*Vagueness of Colorado Law*

Mr. Rodebaugh argues the Colorado regulations that prohibit baiting wildlife with salt are vague on their face and as applied to the facts of this case. We disagree. The Colorado regulations are not unconstitutionally vague as applied to Mr. Rodebaugh's case. We must disregard any facial challenge Mr. Rodebaugh attempts to make.

A law can be unconstitutionally vague on its face or in application. *See Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494-95 (1982); *United States v. Agnew*, 931 F.2d 1397, 1403 (10th Cir. 1991). But a court will consider a law's facial vagueness only if it threatens First Amendment interests or if the challenge is made before enforcement. *See Maynard v. Cartwright*, 486 U.S. 356, 361 (1988); *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1179-80 (10th Cir. 2009). Mr. Rodebaugh does not argue that the Colorado regulations implicate a First Amendment interest, and they already have been enforced against him. As such, we examine the regulations only as applied here.

"Whether a statute has been rendered unconstitutionally vague in its application is an issue of law and the standard of review is therefore de novo." *Agnew*, 931 F.2d at 1403 (emphasis omitted).[13] "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). "A statute can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a

---

[13] Mr. Rodebaugh states, without explanation, that we should apply plain error review. But he is incorrect because he raised this issue in his motion to dismiss the indictment and orally during trial, which preserves the issue for our review on appeal.

reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Jordan v. Pugh*, 425 F.3d 820, 824-25 (10th Cir. 2005) (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000)).

The Colorado regulations that prohibit baiting are not unconstitutionally vague as applied to Mr. Rodebaugh. They provide people of ordinary intelligence a reasonable opportunity to understand what conduct they prohibit—placing salt next to tree stands to aid in the hunting of deer and elk—the exact conduct for which Mr. Rodebaugh was prosecuted. "'One to whose conduct a statute clearly applies may not successfully challenge it for vagueness.'" *Hoffman Estates*, 455 U.S. at 495 n.7 (quoting *Parker v. Levy*, 417 U.S. 733, 756 (1974)). Further, an as-applied challenge fails when a defendant has knowledge of the illegality of his activities. *See United States v. Lovern*, 590 F.3d 1095, 1103 (10th Cir. 2009) (relying on the defendant's knowledge of the illegality of his activities to hold the law in question was not unconstitutionally vague as applied to him); *United States v. Day*, 223 F.3d 1225, 1229 (10th Cir. 2000); *see also Parker v. Levy*, 417 U.S. 733, 757 (1974) ("Void for vagueness simply means that criminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed. In determining the sufficiency of the notice a statute must of necessity be examined in the light of the conduct with which a defendant is charged." (citation and quotations omitted)). Mr. Rodebaugh knew his actions were illegal, as he confessed in his interview with the law enforcement agents.

For these reasons, we conclude these regulations are not unconstitutionally vague as applied to Mr. Rodebaugh.[14]

## C. *Sufficiency of the Evidence*

Mr. Rodebaugh's sufficiency-of-the-evidence argument seemingly rests on two contentions—first, that there was no salt where the animals had been taken and, second, that even if there had been salt, it did not act as a lure. We reject his arguments and affirm on this issue.

"We review a sufficiency of the evidence challenge de novo, viewing the evidence and the reasonable inferences to be drawn therefrom in the light most favorable to the government." *United States v. Hale*, 762 F.3d 1214, 1222 (10th Cir. 2014) (quotations omitted). "We will reverse only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 1222-23 (quotations omitted). In other words, we ask whether "a reasonable jury could find the defendant guilty." *United States v. King*, 632 F.3d 646, 650 (10th Cir. 2011) (quotations omitted). "In conducting this review we may neither weigh conflicting evidence nor consider the credibility of witnesses. It is for the jury, as the fact finder, to resolve

---

[14] Mr. Rodebaugh notes four law enforcement officers testified to the culpability and visibility requirements of the law, differing from each other in their accounts and erring in their interpretations. It is unclear whether he uses the testimony to argue the statute "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "encourages arbitrary and discriminatory enforcement." *Pugh*, 425 F.3d at 824-25 (quoting *Hill*, 530 U.S. at 732).

If the former, we rely on our above reasons to reject his argument. If the latter, we also reject his argument because "the conduct at issue falls within the core of the statute's prohibition, so that the enforcement before the court was not the result of the unfettered latitude that law enforcement officers and factfinders might have in other, hypothetical applications of the statute." *Arriaga v. Mukasey*, 521 F.3d 219, 228 (2d Cir. 2008).

conflicting testimony, weigh the evidence, and draw inferences from the facts presented."

*United States v. McKissick*, 204 F.3d 1282, 1289-90 (10th Cir. 2000) (quotations and citation omitted).

The Government had to prove that Mr. Rodebaugh baited—placing salt to lure or attract wildlife.[15] The evidence is sufficient to sustain the jury's verdict on each count that Mr. Rodebaugh baited.[16]

Before addressing each individual count of conviction, we note Mr. Rodebaugh confessed he placed salt around the stands every year to lure wildlife. He told an agent he knew it was illegal to bait, but that "the guy before me was doing it, and that is the way all my stands are." ROA, Vol. III at 774. During the search of his home, when agents asked if he had salt, he said, "Yes, I still probably have half a bag left there of the salt I was using to put out under the tree stand." *Id.* at 902.

Specific evidence supports each of the counts. Count 2 involved Eugene Haug's kill of an elk from Lower Duck stand in 2005. A reasonable jury could conclude that Mr. Rodebaugh's testimony that he baited the stands every year applied to Lower Duck stand in 2005. In fact, he specifically admitted to baiting Lower Duck stand in 2007, supporting an inference of baiting in 2005.

_____

[15] The Government did not have to prove that salt remained visible on the ground during the hunting season (as opposed to salt that had seeped into the soil) or that an animal was killed coming to or leaving the salt. *See* 2 Colo. Code Regs. §§ 406-0:000(A)(4), 406-0:004(A).

[16] In the argument section of his brief, Mr. Rodebaugh does not specify *which* of his six convictions lack sufficient evidence. However, he does discuss the evidence for most counts in his factual section. As such, we discuss the evidence on each of these counts.

Count 3 involved James More's kill in 2005. Mr. More testified that, while tree-stand hunting from Cathy's stand, he saw animals come into a wallow around the stand and lick the dirt. He eventually shot a cow elk, which had "com[e] up the mountain towards [the wallow]." *Id.* at 1067. A reasonable jury could conclude that the animals approached the wallow and licked the dirt because salt had been spread. The jury could also conclude that Mr. Rodebaugh's testimony that he baited the stands every year applied to Cathy's stand in 2005. In fact, he explicitly admitted to baiting Cathy's stand in 2007.[17]

Count 5 involved Robert Markle's kill of a deer from Lower Duck stand in 2006. He testified the deer had come to the wallow. A jury could reasonably conclude the deer approached the wallow because salt had been spread. The jury could also conclude that Mr. Rodebaugh's testimony that he baited the stands every year applied to Lower Duck stand in 2006. As noted above, he explicitly admitted to baiting Lower Duck stand in 2007.

Count 8 involved Special Agent Brad Merrill's killing a deer in 2007, while working undercover, after seeing what looked like the deer "eating dirt" at Upper Duck stand. *Id.* at 839. Mr. Rodebaugh admitted to baiting the Upper Duck stand in 2007. A reasonable jury could conclude Mr. Rodebaugh was guilty on this count.

Count 9 is closer. This conviction concerned Mr. More's kill of an elk from Paul's stand in 2007. Mr. More testified that the ground around the tree stand was "pretty

---

[17] Count 4 involved Robert Markle's kill in 2005 from Lower Duck stand. Mr. Rodebaugh does not specifically contest this count, so we do not discuss it.

swampy." *Id.* at 1075. He bugled the elk in and believed the elk was attracted to the stand because of the bugling. Mr. Rodebaugh specifically told the agents he did not bait Paul's stand because the stand was in a wet area. But other evidence showed there was a baited spot near Paul's stand. The weighing of this evidence is left to the province of the jury, which could reasonably conclude that Mr. Rodebaugh had baited this location. We affirm the jury's guilty verdict on Count 9.

D. *Calculation of the Guidelines Range*

Mr. Rodebaugh challenges the procedural reasonableness of his sentence. He argues the district court erroneously applied three different enhancements to the base offense level to reach a Guidelines range of 41-51 months. We affirm in each instance.

"We review a sentence of imprisonment for reasonableness under an abuse of discretion standard." *United States v. Kieffer*, 681 F.3d 1143, 1164 (10th Cir. 2012) (citing *Gall v. United States*, 552 U.S. 38, 51 (2007)). "Within that milieu, we review factual findings for clear error and legal determinations de novo." *Id.* (quotations omitted). We will not disturb factual findings "unless they have no basis in the record." *United States v. Martin*, 163 F.3d 1212, 1217 (10th Cir. 1998).

We must "ensure that the district court committed no *significant* procedural error in calculating the advisory guideline range." *Kieffer*, 681 F.3d at 1165 (quotations omitted). "Improperly calculating the Guidelines range, failing to consider the § 3553(a) factors, or selecting a sentence based on clearly erroneous facts are just three examples of likely significant procedural error." *Id.* (quotations and alterations omitted).

1. **Significant Risk of Disease Transmission**

Mr. Rodebaugh argues the two-level enhancement for creating a significant risk of disease transmission among wildlife was "without any evidence and thus unreasonable." Aplt. Br. at 42-43.

The Guidelines state the base offense level must be increased by two "[i]f the offense . . . created a significant risk of infestation or disease transmission potentially harmful to humans, fish, wildlife, or plants." U.S.S.G. § 2Q2.1(b)(2). The district court determined Mr. Rodebaugh's practice of placing salt for elk and deer created a significant risk of elk and deer spreading disease. We agree.

The record contains numerous photographs showing elk gathering at the locations where Mr. Rodebaugh placed salt near tree stands. In their briefing, the parties focus on one photograph in particular—Exhibit 48. It depicts five elk with their noses down on the ground at a salt lick in front of Big Ridge stand. Elissa Knox, a District Wildlife Manager for the Colorado Division of Parks and Wildlife (CPW), testified that the scene was "not necessarily a natural feeding practice for big game." ROA, Vol. III at 970; ROA, Vol. IV at 219. Officer Knox continued, "Elk are grazing animals. So they'll feed in big groups close to each other, but when they are actually feeding on the plants, they are eating separate plants, and they don't have any actual nose-to-nose contact." ROA, Vol. IV at 219. When elk are artificially fed with salt, "where their noses are actually together in the . . . same pile of food, that is not a natural feeding pattern for them, and it increases their direct physical contact which, therefore, increases the potential for disease

transmission." *Id.* at 220. She testified that the behavior in Exhibit 48 constitutes a significant risk of disease transmission. *Id.* at 220-21.

Officer Bailey Franklin, another District Wildlife Manager for CPW, testified similarly as to Exhibit 48, noting that "animals don't congregate naturally in large groups like this." ROA, Vol. III at 233, 631. Officer Franklin said, "And the most contact, in animals that are continually attracted to the same site and urinating and defecating and touching their nose to those same sites with multiple animals, is very concerning with disease transmission." *Id.* at 631.

Mr. Rodebaugh has not demonstrated the district court erred in finding a significant risk of disease transmission. Some of Mr. Rodebaugh's arguments are factual allegations directly contrary to points made by Officers Knox and Franklin.[18] His other assertions are irrelevant. For example, Mr. Rodebaugh argues there is no evidence the elk here had nose-to-nose contact. But Officer Knox said having noses in close proximity increases the risk the noses will touch, which increases the potential for disease transmission. In fact, Officer Franklin's testimony suggests that nose-to-nose contact might not even be necessary for disease transmission if the animals are urinating and defecating in the same area. Moreover, as the district court noted, the Government did not have to prove that "any particular elk or deer actually became diseased." ROA, Vol. IV at 267. It only needed to show Mr. Rodebaugh's actions created a significant risk. Finally, to the extent Mr. Rodebaugh attempts to discredit the officers' testimony, he

---

[18] For example, Mr. Rodebaugh contends, "[T]here was no evidence of disease or the spreading of disease in the same geographic area in this case." Aplt. Br. at 45. But Ms. Knox testified that disease is present in the White River National Forest.

cannot prevail because it is not this court's role to reweigh expert testimony that the district court found credible. *See United States v. Hanson*, 534 F.3d 1315, 1319 (10th Cir. 2008).

We thus affirm the two-level enhancement under U.S.S.G. § 2Q2.1(b)(2)(B).

2. **Value of Wildlife**

Mr. Rodebaugh also argues the district court erred in calculating that the "market value" of the wildlife taken by his activities amounted to more than $30,000, which resulted in a six-level enhancement. *See* U.S.S.G. § 2Q2.1(b)(3)(A)(ii) (cross-referencing U.S.S.G. § 2B1.1(b)(1)(D), which increases the base offense level by six if the loss is more than $30,000).

The Guidelines explain how to calculate the market value of wildlife as follows:

When information is reasonably available, "market value" under subsection (b)(3)(A) shall be based on the fair-market retail price. Where the fair-market retail price is difficult to ascertain, the court may make a reasonable estimate using any reliable information . . . .

U.S.S.G. § 2Q2.1 cmt. n.4. We have explained this standard as follows: "First, a district court must attempt to discern the 'fair-market retail price' of an animal. If, and only if, 'the fair-market retail price is difficult to ascertain,' a court can instead 'make a reasonable estimate' of the price using 'reliable information.'" *United States v. Butler*, 694 F.3d 1177, 1181 (10th Cir. 2012) (quoting U.S.S.G. § 2Q2.1 cmt. n.4). "In other words, a district court must make a factual determination that the fair-market retail price is not readily available before resorting to estimation of the animal's value." *Id.*

Here, the district court did not clearly err when it found the fair-market retail price is difficult to discern because there is no fair market for wild deer or elk. Such a market would be illegal under Colorado law. *See* Colo. Rev. Stat. § 33-6-113 ("[I]t is unlawful for any person to knowingly sell or purchase, or knowingly offer for sale or purchase, wildlife or to solicit another person in the illegal hunting or taking of wildlife for the purposes of monetary or commercial gain or profit."); *see also United States v. Eyoum*, 84 F.3d 1004, 1008 (7th Cir. 1996) (noting courts have estimated the market value when retail prices were unavailable for illegal goods).

Mr. Rodebaugh has not offered evidence of fair-market value. *See United States v. Dove*, 247 F.3d 152, 159 (4th Cir. 2001) (noting the district court did not err in estimating the market value when there was "no firm evidence of what the retail price might be"). He contends the district court should have considered that when the State of Colorado sues to recover wildlife unlawfully taken, it can recover a minimum of $700 for elk and $500 for deer. *See* Colo. Rev. Stat. § 33-6-110. This provision concerns the *minimum* recovery for elk and deer in the context of a *civil action*, not what "a willing buyer would pay to a willing seller for the [game] in question." *Butler*, 694 F.3d at 1181. In fact, the provision specifically states the value can be greater "as the evidence may show the value of the wildlife to have been when living and uninjured." Colo. Rev. Stat. § 33-6-110(2).

After finding the fair-market retail price was difficult to discern, the district court made a reasonable estimate of the price using reliable information from testimony by Government witnesses. The court determined the price of processed elk meat ranged

from $1,200 to $1,850. In addition, it took into account the trophy value of the six bull elk because bull elk are shot not only for their meat value, but also because they are trophy animals. Using estimates from bred elk, the court determined the trophy value would be $1,770 for four-point and five-point bull elk and $2,300 for six-point bull elk.[19] It then estimated the value of the wildlife taken using Mr. Rodebaugh's relevant conduct, which encompassed the kills of 14 elk, one deer buck, and one deer doe. The court's total calculation came to $37,390.[20]

Mr. Rodebaugh contends the court erred in considering, as relevant conduct, the value of the animals taken as a result of unindicted, dismissed, or acquitted conduct and in determining this conduct was illegal. But "[r]elevant conduct under the Guidelines . . . comprises more, often much more, than the offense of conviction itself, and may include uncharged and even acquitted conduct." *United States v. Griffith*, 584 F.3d 1004, 1012 (10th Cir. 2009) (quotations omitted). Indeed, relevant conduct includes all the "acts and omissions" that were "part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2). But "relevant conduct still must

---

[19] "Four-point," "five-point," and "six-point" refer to the number of points on the bull elk's antlers. The district court indicated the trophy value would be $2,300 for each of the two six-point bull elk, contrary to Mr. Rodebaugh's contention that the district court failed to state whether the $4,600 trophy value was for one elk or both. The $2,300 figure was based on the fact Colorado fines at least $10,000 for the illegal taking of such elk. *See* Colo. Rev. Stat. § 33-6-109(3.4)(a)(I). So the district court's estimate of $2,300 was conservative, and Mr. Rodebaugh does not explain why using the $10,000 as a benchmark was erroneous.

[20] In fact, the district court did not include the value of the deer buck and doe in its calculations, making its calculations conservative.

relate to the offense of conviction" and must constitute a criminal offense under either a federal or state statute. *Griffith*, 584 F.3d at 1012-13.

Although eight of the elk kills considered in the relevant conduct calculus were unindicted, the district court properly included them as relevant conduct because they were part of the same course of conduct as the offenses of conviction and were illegal takings. Between 2003 and 2007, hunters illegally took these elk out of the state after killing them at tree stands that Mr. Rodebaugh admitted to salting. We find no error in the district court's inclusion of these eight kills as relevant conduct.

3. **Obstruction of Justice**

Mr. Rodebaugh's final attack on his total offense level concerns the two-level enhancement for obstruction of justice under U.S.S.G. § 3C1.1.[21] This enhancement applies if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction" and "the obstructive conduct related to . . . the defendant's offense of conviction and any relevant conduct." U.S.S.G. § 3C1.1. The enhancement applies when a defendant perjures himself. *See United States v. Poe*, 556 F.3d 1113, 1130 (10th Cir. 2009). To establish perjury, a district court must conclude the defendant "(1) gave false testimony under oath, (2) about a material matter, and (3) the false testimony was willful and not the result of confusion, mistake or faulty memory." *Id.*

---

[21] Mr. Rodebaugh also argues the district court failed to make sufficient findings on this issue. We reject this argument because, as will be evident below, the district court made sufficient findings.

- 29 -

Here, the district court concluded Mr. Rodebaugh had willfully testified falsely under oath during court proceedings about three material matters: that (a) he placed salt at his tree stands only in the spring or early spring, (b) he believed it was legal to place salt at his tree stands so long as it was gone by the time the hunters arrived, and (c) he did not buy the tree stands from Mr. Peters. We need only find that the court was correct on one of these matters to affirm the two-level enhancement.

a. *Mr. Rodebaugh's testimony that he placed salt at the tree stands in the spring or early spring*

Mr. Rodebaugh asserted throughout trial that he placed salt at his tree stands only in the "spring" or "early spring." ROA, Vol. III at 1367-68, 1373, 1379-80, 1425, 1436. At one point, he explained that he placed the salt during the spring because the "animals need [it] in the spring, especially when they are growing horns and having babies." *Id.* at 1368. He said the animals have their offspring in May or early June. He clarified, however, that "early spring" depends on the year. *Id.* at 1428. In some years he needed to wait until the "snow gets out," *id.*, which sometimes did not occur until June. The latest he ever placed salt was the first week of July.

The district court considered only Mr. Rodebaugh's testimony that he salted in the "spring" and "early spring" and did not consider Mr. Rodebaugh's testimony that he would sometimes place salt at the tree stands as late as the first week of July.[22] It noted that receipts from Snyder & Counts demonstrated Mr. Rodebaugh purchased large

---

[22] It is not clear why the district court did not consider this testimony. Although Mr. Rodebaugh may have failed to remind the court of this testimony in his objection to the PSR or at the sentencing hearing, the Government did cite to it in its sentencing memorandum.

amounts of salt in July, "which is well outside any definition of spring or early spring." ROA, Vol. IV at 269. Because it concluded this was a material lie and was not the result of confusion, mistake, or faulty memory, the district court imposed the enhancement.

We affirm, but on slightly different grounds. We consider Mr. Rodebaugh's testimony that he baited as late as the first week of July, but we note the receipts from Snyder & Counts—submitted as evidence during trial—demonstrate he purchased salt past the first week of July. *See* Gov't Supp. App. at 80, 84, 91 (showing receipts from July 15, 2002; July 10, 2003; and July 10, 2006). Mr. Rodebaugh's lie was material because it furthered the "effort to support his defense that baiting with salt is legal as long as the salt is gone by the time the hunters arrive." ROA, Vol. IV at 269. We agree with the district court that the lie was "not the result of confusion, mistake or faulty memory. He was very clear and adamant in his claim . . . ." *Id.*

As such, we affirm the district court's application of a two-level enhancement based on this perjury.

b. *Mr. Rodebaugh's belief that it was legal to place salt at his tree stands so long as the salt was gone by the time the hunters arrived*

Mr. Rodebaugh testified that he believed it was legal to place salt near his tree stands as long as the salt was not visible or present by the time his hunters arrived. But he told agents without qualification that he knew placing the salt at his tree stands was illegal. The district court determined his testimony about the legality of baiting was a material lie.

Mr. Rodebaugh fails to challenge the district court's determination on this issue in his opening brief, though he attempts to make the argument in his reply brief. We therefore decline to consider this argument. *See Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007) ("[W]e routinely have declined to consider arguments that are not raised . . . in an appellant's opening brief.").

c.  *Mr. Rodebaugh's statement he did not buy the tree stands from Mr. Peters*

Mr. Rodebaugh testified he did not buy the tree stands from Mr. Peters. The Government then impeached him with an "Agreement of Sale" between him and Mr. Peters, showing Mr. Rodebaugh had paid $5,000 for permits and tree stands. Mr. Rodebaugh claimed he "had totally forgotten" about the purchase. ROA, Vol. III at 1416. He said he thought he had paid $5,000 for "the trailer and the business." *Id.* at 1417.

The district court determined this false testimony was material because it "had the capability of affecting the jury's decision on defendant's guilt, because it could have made it more likely that someone else had placed the salt at defendant's tree stands." ROA, Vol. IV at 272. Further, it determined the testimony was willful and not the product of faulty memory, explaining the agreement nowhere mentioned a trailer and

> tree stands are the main form of hunting that defendant provides to his hunters, and . . . the tree stands were specifically mentioned and included in the Agreement of Sale. Because the tree stands were so vital to defendant's outfitting business, his claim that he simply forgot that he purchased those very tree stands is . . . implausible.

*Id.* We conclude the district court's determination was not erroneous and affirm.

## E. *Supervised Release Condition*

As noted in the per curiam introduction, this section is a dissent from Judge Bacharach's separate opinion on this issue, which Judge Moritz joins.

Mr. Rodebaugh argues the district court erred in imposing the following three-year supervised release condition: "The defendant shall not be allowed to hunt and/or kill any wildlife or fish. He may not guide or outfit hunters in any state and may not hunt or fish, or accompany anyone hunting or fishing anywhere in the United States." ROA, Vol. II at 764.

> Mr. Rodebaugh challenged this condition in his written objections to the PSR:

> The Defendant does not object to the time served recommendation nor community service, however, he does object to preventing the Defendant from fishing and hunting or accompanying anyone hunting or fishing anywhere in the United States. The Defendant has or will lose his Colorado outfitter's license and Federal permits. The Defendant derives his only pleasure from hunting (now limited to non-firearm hunting) and fishing in the secluded White River valley or elsewhere (Kentucky).

*Id*. at 677 (footnote omitted).

During the sentencing hearing, the parties discussed the status of Mr. Rodebaugh's licensing privileges. The Government noted that Mr. Rodebaugh's hunting and fishing licenses in Colorado could be revoked for life. Mr. Rodebaugh's counsel also noted that Colorado had initiated proceedings that would result in Mr. Rodebaugh losing his state outfitting license for a minimum of two years.

In a Rule 28(j) letter, the Government reported that CPW suspended Mr. Rodebaugh's wildlife license privileges for life. This suspension *may* also be in effect in other states. The Colorado Office of Outfitters Registration suspended Mr. Rodebaugh's

- 33 -

outfitters license, but he became eligible to reapply in February 2015.  His CPW lifetime

wildlife suspension does not necessarily prohibit Mr. Rodebaugh from obtaining an

outfitters license.

1. **Standard of Review and Legal Background**

"When the defendant objects to a special condition of supervised release at the

time it is announced, this Court reviews for abuse of discretion." *United States v.*

*Dougan*, 684 F.3d 1030, 1034 (10th Cir. 2012) (quotations omitted).  "Thus, we will not

disturb the district court's ruling absent a showing it was based on a clearly erroneous

finding of fact or an erroneous conclusion of law or manifests a clear error of judgment."

*United States v. Bear*, 769 F.3d 1221, 1226 (10th Cir. 2014) (quotations omitted).  "The

district court generally enjoys broad discretion in setting a condition of supervised

release." *United States v. Erwin*, 299 F.3d 1230, 1232 (10th Cir. 2002).  "However, this

discretion is not without limits." *United States v. Mike*, 632 F.3d 686, 692 (10th Cir.

2011).  For instance, the conditions imposed must satisfy the statutory requirements of 18

U.S.C. § 3583(d), two of which are relevant here:

> First, they must be reasonably related to at least one of following:  the nature and circumstances of the offense, the defendant's history and characteristics, the deterrence of criminal conduct, the protection of the public from further crimes of the defendant, and the defendant's educational, vocational, medical, or other correctional needs.  Second, they must involve no greater deprivation of liberty than is reasonably necessary to achieve the purpose of deterring criminal activity, protecting the public, and promoting the defendant's rehabilitation.

*Mike*, 632 F.3d at 692 (citations omitted). "A sentencing court need not provide reasons for each specific special condition that it imposes; rather, it must only provide a generalized statement of its reasoning." *Id.* at 693 (quotations omitted).

Occupational restrictions, however, are subject to "special scrutiny." *Butler*, 694 F.3d at 1184. The law both authorizes and limits occupational restrictions. Under the Comprehensive Crime Control Act of 1984, a court may require an individual on supervised release to "refrain . . . from engaging in a specified occupation, business, or profession." U.S.S.G. § 5F1.5 cmt. background (alteration omitted) (quoting 18 U.S.C. § 3563(b)(5)) (noting this language has been incorporated by reference into § 3583(d)). The condition must comply with the U.S.S.G. § 5F1.5 criteria:

> (a) The court may impose a condition of probation or supervised release prohibiting the defendant from engaging in a specified occupation, business, or profession, or limiting the terms on which the defendant may do so, only if it determines that:
>
> > (1) a reasonably direct relationship existed between the defendant's occupation, business, or profession and the conduct relevant to the offense of conviction; and
> >
> > (2) imposition of such a restriction is reasonably necessary to protect the public because there is reason to believe that, absent such restriction, the defendant will continue to engage in unlawful conduct similar to that for which the defendant was convicted.
>
> (b) If the court decides to impose a condition of probation or supervised release restricting a defendant's engagement in a specified occupation, business, or profession, the court shall impose the condition for the minimum time and to the minimum extent necessary to protect the public.

U.S.S.G. § 5F1.5. First, the condition must both (1) relate directly to the criminal conduct and (2) be reasonably necessary to protect the public. Second, it must be

imposed only for the minimum time and to the minimum extent necessary to protect the public. As for the minimum restriction requirement of § 5F1.5(b), this court said in *Butler* that "[a] district court's duty to specifically find that a restriction is minimally restrictive is *mandatory*." 694 F.3d at 1184 (emphasis added) (quotations omitted). A court must make "specific findings." *United States v. Dunn*, 777 F.3d 1171, 1178 (10th Cir. 2015).

2. **Analysis**

Mr. Rodebaugh objects to the occupational restriction and the district court's failure to make specific findings to support it. Unlike Judge Bacharach's majority opinion on this issue, I believe we should reach the merits of Mr. Rodebaugh's argument on the lack of specific findings. Because the district court failed to make the necessary findings, I would vacate the occupational restriction and remand.

My analysis proceeds as follows:

- Mr. Rodebaugh did not invite error, including the district court's failure to make specific findings to justify the occupational restriction.

- But he failed to object in the district court to the lack of specific findings. He therefore forfeited the argument below. He addressed the lack-of-specific-findings argument in his appellate brief, but he did not argue plain error. He therefore waived the argument.

- The Government did not argue in its brief that Mr. Rodebaugh waived the argument, and it addressed the argument on the merits. The Government therefore waived or forfeited Mr. Rodebaugh's waiver, and it did not cure its waiver or forfeiture at oral argument.

- We have discretion under these circumstances to reach the merits. We should, mainly because both parties agree the district court erred.

- I would vacate and remand for further proceedings on the occupational restriction condition.

a. *Waiver*

    i. Mr. Rodebaugh's alleged invited error

Before oral argument, this panel asked the parties to address whether Mr. Rodebaugh's statement in his written objections to the PSR that he "has or will lose his Colorado outfitter's license and Federal permits," ROA, Vol. II at 677, constituted invited error. After considering their responses, I conclude it did not.

Statements amounting to invited error are "a species of waiver" and "accomplished by intent." *United States v. Griffin*, 294 F. App'x 393, 395 (10th Cir. 2008) (unpublished) (quotations omitted). Unlike forfeiture, which "comes about through neglect," invited error precludes a party from arguing against a proposition the party willingly adopted. *Id*. (quotations omitted). Here, Mr. Rodebaugh's statement falls short of an attempt to "induce the district court to do anything it would not otherwise have done," *United States v. Mo9rrison*, 771 F.3d 687, 694 (10th Cir. 2014) (emphasis omitted), or to "affirmatively approv[e]" the court's imposition of the condition and its failure to make findings, *United States v. Cornelius*, 696 F.3d 1307, 1319 (10th Cir. 2012).

The condition imposed in this case is broader than any error Mr. Rodebaugh may have invited in two respects. First, Mr. Rodebaugh's statement concerned only his *Colorado* outfitters license and *federal* permits. Indeed, at the sentencing hearing, both Mr. Rodebaugh and the Government discussed only his Colorado licensing restrictions.

The condition, however, prohibits any guiding and outfitting "in any state" and accompanying anyone hunting and fishing "anywhere in the United States." ROA, Vol. II at 764. Second, Mr. Rodebaugh was eligible to reapply for his outfitters license in February 2015. By contrast, the condition applies for three years after his release from prison, meaning an exceptionless ban exists until at least 2019.

The statement also did not invite the district court to err by failing to make findings. Mr. Rodebaugh did not "affirmatively approv[e]," *Cornelius*, 696 F.3d at 1319, the court's failure to make specific findings because he made no statements to that effect. Further, the district court did not rely on any invitation when it failed to make findings. *See United States v. Deberry*, 430 F.3d 1294, 1302 (10th Cir. 2005) (quotations omitted) (noting the doctrine of invited error is "based on reliance interests"). At sentencing, the district court acknowledged it was imposing an occupational restriction subject to special scrutiny and quoted § 5F1.5(b). This acknowledgment shows the court understood it had to make sufficient findings, which in turn indicates Mr. Rodebaugh's statement was not an invitation to do the opposite. Thus, the statement did not "induce," *Morrison*, 771 F.3d at 694 (emphasis omitted), or "provoke[]," *United States v. Wells*, 519 U.S. 482, 488 (1997) (quotations omitted), the district court to err by failing to make findings.[23]

---

[23] Unlike the majority, I am reluctant to conclude Mr. Rodebaugh "admitted in oral argument that he was at fault for the district court's lack of specificity." Maj. Op. at 2. He did not do so in his brief. Although at one point during the oral argument he may have made such a concession, Mr. Rodebaugh's counsel reiterated he had only discussed Colorado and federal permits in his objection to the PSR and that Mr. Rodebaugh could reapply for his outfitters license in 2015. Oral Arg. at 6:50-8:40. Further, his counsel had earlier said his objection to the PSR only "perhaps" invited an error. *Id.* at 3:37-45.

On invited error, the majority opinion concludes "the district court addressed the occupational restriction with an understanding that Mr. Rodebaugh's sole concern was his ability to continue hunting and fishing for pleasure," Maj. Op. at 7, and the district court "knew only that Mr. Rodebaugh had viewed the occupational restriction as immaterial because of the impending loss of his outfitter's license and federal permits," *id.* at 8. I differ in three respects. First, the district court at most knew Mr. Rodebaugh did not object to restricting his *Colorado* license and *federal* permits until February 2015. There is no indication in the record it "knew" that restricting his occupation in all states until at least 2019 would be acceptable to Mr. Rodebaugh. Second, there is no indication in the record the court "knew" such a restriction would not require specific findings. As explained above, the district court's statements at sentencing indicate the opposite. Third, and most troubling, is the majority's expansion of the invited error doctrine to encompass seemingly implicit invitations to err, in contrast to our case law indicating such invitations must affirmatively approve of the error. *See, e.g.*, *Cornelius*, 696 F.3d at 1319.

ii. Mr. Rodebaugh's other possible waiver

I cannot find where Mr. Rodebaugh preserved an objection to the district court's failure to make specific findings, and he does not argue plain error on appeal. He has therefore waived the lack-of-specific-findings argument. *See Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1130-31 (10th Cir. 2011); *McKissick v. Yuen*, 618 F.3d 1177, 1189 (10th Cir. 2010) ("[E]ven if Ms. McKissick's duress arguments were merely forfeited

before the *district court*, her failure to explain in her opening appellate brief why this is so and how they survive the plain error standard waives the arguments in *this* court.").

As for his challenge to the content of the occupational restriction, Mr. Rodebaugh may not have waived this challenge below. In his written objections to the PSR, he did not specifically object to the part of the condition prohibiting guiding and outfitting in any state. But he objected to the restriction on accompanying others in hunting and fishing. Because his outfitting and guiding business necessarily involves accompanying others in their hunting, this objection may have sufficiently preserved his argument against the occupational restriction itself. But I need not resolve this issue because I would vacate and remand for more specific findings without deciding whether the district court erred as to the content and scope of the occupational restriction.

### iii. The Government's waiver or forfeiture

The court may, however, consider Mr. Rodebaugh's argument because the Government failed to argue in its brief that Mr. Rodebaugh did not preserve his lack-of-specific-findings challenge. In its brief, the Government failed to argue Mr. Rodebaugh had not objected below and had not argued plain error in his opening brief. The Government not only failed to argue forfeiture or waiver in its brief, it even addressed Mr. Rodebaugh's lack-of-specific-findings argument on the merits under the abuse-of-discretion standard. By the end of briefing, therefore, the Government had clearly waived or forfeited any objection to Mr. Rodebaugh's failure to preserve his lack-of-

specific-findings argument. This is textbook waiver or forfeiture of the waiver.[24] *See*

*Abernathy v. Wandes*, 713 F.3d 538, 552 (10th Cir. 2013); *United States v. Heckenliable*,

446 F.3d 1048, 1049 n.3 (10th Cir. 2006) ("Defendant concedes he did not challenge the

validity of his plea before the district court. The Government, however, does not argue

Defendant waived his present challenge, and accordingly, has waived the waiver. We

will consider the merits of Defendant's challenge." (citations omitted)); *United States v.*

*Reider*, 103 F.3d 99, 103 n.1 (10th Cir. 1996) (reaching the merits where "the

government has not contended that [the defendant's waiver] preclude[s] defendant from

challenging" the relevant district court rulings).

Only at oral argument, and only after this panel prompted it to do so, did the

Government make an invited error argument. The majority opinion credits that argument

as curing the Government's waiver or forfeiture of the waiver in its brief, Maj. Op. at 7-8,

but I respectfully disagree. First, the majority has not pointed to a single case that credits

---

[24] Whether the Government intentionally waives a defendant's waiver or unintentionally forfeits it, we have the discretion in either instance to reach the merits of the defendant's otherwise waived argument. *See Abernathy*, 713 F.3d at 552 ("We elect to consider Mr. Abernathy's Suspension Clause argument, at least in part, because the government *neglected* to raise his failure to preserve the argument in its briefing." (emphasis added)); *United States v. McGehee*, 672 F.3d 860, 873 n.5 (10th Cir. 2012) ("[A] colorable argument could be advanced that we should overlook [the appellant's] apparent failure to preserve his acceptance-of-responsibility argument because the government *forfeited* the right to object to it" by "not argu[ing] that [the appellant] failed to preserve this argument." (emphasis added)); *United States v. DeVaughn*, 694 F.3d 1141, 1158 (10th Cir. 2012) (proceeding to the merits of the defendant's argument even though the government may only have forfeited the defendant's waiver).

a waiver argument by the Government made only upon prompting *by the court*.[25]

Second, I am not convinced a waiver argument made for the first time at oral argument would cure the Government's clear waiver or forfeiture in its briefing. The only Tenth Circuit case I have found that credited the government's waiver contention made for the first time at oral argument "[did] not accord the fact great weight in [its] analysis" and only "accord[ed] some small benefit to the government for that step." *United States v. McGehee*, 672 F.3d 860, 873 n.5 (10th Cir. 2012); *see United States v. Menesses*, 962 F.2d 420, 425-26 (5th Cir. 1992) (refusing to recognize the government's waiver argument when the argument was not made in the briefs, but only at oral argument, and deciding "[t]he government cannot, at this later date, alter its proposed standard of review").

Even assuming the Government could argue waiver for the first time at oral argument, the Government's invited-error argument here was inadequately presented and thus unpreserved. *See United States v. DeVaughn*, 694 F.3d 1141, 1154-55, 1154 n.9, 1158 (10th Cir. 2012) (holding the government waived or forfeited the defendant's waiver even though it had made some relevant statements at oral argument and in its brief because its arguments were perfunctory); *Wilburn v. Mid-South Health Dev., Inc.*, 343 F.3d 1274, 1281 (10th Cir. 2003) (noting that we "will not consider issues that are raised

---

[25] My concern is that the majority's position might allow a panel to excuse a waiver of a waiver by asking the parties to "be prepared to address" an argument that was otherwise waived in the briefs. Maj. Op. at 7 n.4 (quoting Order, United States v. Rodebaugh, No. 13-1081, at *1 (10th Cir. Apr. 30, 2015)). Whether or not our order was a "prompt," *see id.*, we asked the Government to address invited error.

on appeal but not adequately addressed"). The Government's argument was hardly a "more pointed contention." Maj. Op. at 7. At oral argument, the Government merely asserted there was invited error and only for about 25 seconds. Oral Arg. at 22:43-55; 23:59-24:12. At no point did it mention Mr. Rodebaugh's failure to object below to the lack of specific findings, his failure to argue plain error in his brief, or even his objection to the PSR. The Government also failed to explain why any invitation to the district court to err extended to failing to make findings. Nor did the Government provide any legal authority for its invited error argument. *See Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 841 (10th Cir. 2005) (noting issues cannot be properly preserved if a party cites to no legal authority to support its contention); *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1169 (10th Cir. 2002) (holding that an argument consisting entirely of conclusory statements and unhelpful citations was deemed waived). I thus disagree with the majority's assertion that it is simply enough that "we know the government objects on the ground that Mr. Rodebaugh did not preserve the issue." Maj. Op. at 8. Our case law requires more than conclusory assertions for a court to credit a party's argument. *See Utahns for Better Transp.*, 305 F.3d at 1169.[26]

The majority also states, "The government acknowledged that the district court had failed to make specific findings, but attributed the omission to Mr. Rodebaugh's representation that he would soon lose his outfitter's license and federal permits

---

[26] I agree with the majority that objections before the district court must be sufficiently definite to preserve an issue for appellate review. Maj. Op. at 3-4. But, as noted above, similar standards apply to a party's arguments on appeal.

regardless of what the court did." Maj. Op. at 10; *see also id.* at 9 n.6. I cannot find where in the oral argument the Government made such an attribution. Although the Government mentioned the license suspensions, it did not explicitly link this to its invited error assertions and seemed to use it instead as part of its harmless error analysis. Oral Arg. at 21:25-59; 24:10-22.

In sum, the Government waived or forfeited Mr. Rodebaugh's waiver by the close of briefing. We opened the door at oral argument to a previously unraised invited-error argument. We would be overly generous to conclude that our assistance and the resultant inadequate argumentation remedied the Government's failure to raise a waiver argument in its brief. Having already waived or forfeited the waiver in its brief, the Government did not change that at oral argument, even when the panel gave it an extra chance to do so.

iv. Discretion to reach the merits

This panel has discretion to overlook the Government's waiver or forfeiture, *see McGehee*, 672 F.3d at 873 n.5, but I would choose not to exercise it here. The Government admitted at oral argument that the district court had failed to make the necessary occupational restriction findings. The parties' agreement that the district court erred is a compelling reason to reach the merits, especially in light of our court's recent observation that "readily avoidable errors regarding [conditions of supervised release] appear too frequently on our docket." *United States v. Martinez-Torres*, No. 14-2084, 2015 WL 4590987, at *1 (July 31, 2015). Further, our circuit has recently emphasized

that "[a] district court's duty to specifically find that a restriction is minimally restrictive is *mandatory*." *Butler*, 694 F.3d at 1184 (emphasis added) (quotations omitted).[27]

In considering whether to exercise discretion, the majority opinion engages in a "dueling waivers/forfeitures" analysis. Maj. Op. at 6. But our case law does not compare the relative weights of "dueling waivers/forfeitures" when deciding whether to exercise discretion to overlook the government's waiver.[28]

In fact, many of our cases proceed to the merits in the face of a government waiver or forfeiture without analyzing whether to exercise the court's discretion to overlook it. *See, e.g.*, *Abernathy*, 713 F.3d at 552; *DeVaughn*, 694 F.3d at 1154 n.9; *Cook v. Rockwell Intern. Corp.*, 618 F.3d 1127, 1138-39 (10th Cir. 2010); *Heckenliable*, 446 F.3d at 1049 n.3; *Reider*, 103 F.3d at 103 n.1. Even without a government waiver or forfeiture, this court still has discretion to overlook a defendant's waiver. *Abernathy*, 713 F.3d at 552

---

[27] The majority opinion states it would be "inequitable" to "excuse" Mr. Rodebaugh's waiver. Maj. Op. at 10. Inequitable as to whom? Not Mr. Rodebaugh, who was entitled to specific findings. Not the Government, which agrees the district court should have made them. Not the district court, which erred. Indeed, if fairness is the touchstone, we should exercise our discretion to reach the merits.

[28] The only case that arguably comes close is *McGehee*. In *McGehee*, the defendant had waived a sentencing argument. 672 F.3d at 873. The government did not argue waiver or forfeiture in its brief. *Id.* at 873 n.5. Regardless, we did not excuse the defendant's waiver, pointing out that the defendant did not argue the government had waived or forfeited the waiver and that the government argued lack of preservation at oral argument (though we did not accord the latter "great weight"). *Id.* We concluded, "In any event, we are not obliged to apply forfeiture principles to the government's briefing omission; such decisions are discretionary." *Id.*

We have discretion to reach the merits here. I think correcting a district court error that both parties agree upon is a compelling reason to reach the merits. I find less persuasive the majority's weighing of the two waivers.

- 45 -

(noting we have discretion to overlook a defendant's waiver and that reaching the merits of a defendant's waived argument is appropriate when the government has forfeited the waiver, without engaging in an analysis of whether to overlook the government's forfeiture).[29]

b. *Merits*

Having decided to reach the merits because the Government has waived or forfeited the waiver, I would follow our case law and other circuit case law providing for abuse-of-discretion review.[30]

---

[29] The majority asserts it is "not drawing any conclusions on the invited error doctrine," Maj. Op. at 8 n.5, but it does rely on invited error in weighing Mr. Rodebaugh's waiver against the Government's. Its analysis about our discretion to reach the merits views Mr. Rodebaugh's objection to the PSR as an invitation to err that the district court relied upon. *See id*. at 7 ("Thus, the district court addressed the occupational restriction with an understanding that Mr. Rodebaugh's sole concern was his ability to continue hunting and fishing for pleasure.").

If I were to adopt the majority's "dueling waivers/forfeitures" approach, I would compare Mr. Rodebaugh's failure to object below and to argue plain error on appeal with the Government's waiver or forfeiture in its briefing.

[30] *See, e.g.*, *United States v. Faust*, No. 14-8011, 2015 WL 4620406, at *14-16 (10th Cir. 2015) (noting the defendant may have forfeited his argument, but the government waived his possible forfeiture, and therefore the abuse-of-discretion standard applied even though the defendant had suggested plain error should apply); *Cook*, 618 F.3d at 1138-39 (noting the plaintiffs forfeited their opportunity to raise the defendants' forfeiture and then addressing the merits under de novo review); *Heckenliable*, 446 F.3d at 1049-50; *Reider*, 103 F.3d at 103; *see also Menesses*, 962 F.2d at 425-26 (noting the government did not raise the defendant's failure to preserve its argument until oral argument and then applying the conventional sufficiency-of-the-evidence standard to the merits of the defendant's arguments); *United States v. Archambault*, 62 F.3d 995, 998 (7th Cir. 1995) ("[B]ecause the government does not argue that Archambault waived this challenge, it has waived Archambault's waiver. Accordingly, we will review Archambault's claim as if it were raised below." (citation omitted)); *United States v. Leichtnam*, 948 F.2d 370, 375 (7th Cir. 1991) (noting the government did not argue in its

In *Butler*, we faced a similar special condition, which the defendant challenged because it was "overbroad and interfere[d] with his occupation." *Id.*[31] Because the district court had failed to satisfy § 5F1.5(b) by "specifically find[ing] that [the] restriction [was] minimally restrictive," we remanded for resentencing. *Id.* at 1184-85. We explained that "the sentencing record is devoid of any finding that the occupational restriction is the minimum restriction necessary." *Id.* at 1185 (quotations omitted). For substantially the same reason, I would do the same here.

I begin by noting all of the district court's statements that could possibly justify this special condition. At the sentencing hearing, the district court first heard arguments from the parties on whether Mr. Rodebaugh's request for a sentence of time served would be adequate. It determined it would not:

---

brief or at oral argument that the defendant waived his argument and addressing the defendant's argument "on the merits and without the screen of the plain error standard").

I recognize that some of these cases termed the government's actions as one of "waiver" rather than "forfeiture." But nothing in the case law indicates plain-error review applies to government forfeiture and abuse of discretion to government waiver. Rather, *Abernathy* seems to indicate that de novo review would have applied in the face of the government's forfeiture if it were not for the two considerations it enumerated. 713 F.3d at 552 (deciding to address the merits of the defendant's waived argument after noting the government's forfeiture but declining to use de novo review because of two separate considerations). Indeed, the Fifth Circuit in *Menesses* did not apply plain error even when the government seems to have forfeited, rather than waived, its preservation argument in its briefing, 962 F.2d at 425-26 (noting the government argued the defendant's waiver for the first time at oral argument, which would seem to indicate its failure to do so earlier had been forfeiture, rather than waiver), and neither did we in a civil case, *see Cook*, 618 F.3d at 1138-39 (applying de novo review when the plaintiffs forfeited the defendants' forfeiture).

[31] The *Butler* condition said the defendant "may not hunt, fish or trap any wildlife, nor accompany others engaged in such activity, nor provide guiding, outfitting or other hunting, fishing, or trapping related services." *Butler*, 694 F.3d at 1184 (quotations omitted).

The crimes committed by this defendant are serious, especially given the nature and circumstances of the offense and the length of time over which Mr. Rodebaugh conducted this illegal activity. The Court does not agree that a sentence of time served, which in this case is only a day, is an appropriate sentence. The defendant engaged in this criminal activity for years, beyond those for which he was charged and convicted. His criminal activity resulted in large amounts of deer and elk being illegally taken from the White River National Forest.

ROA, Vol. IV at 296-97. The court also said Mr. Rodebaugh accepted no responsibility for his actions and easily "concocted falsehoods to justify his actions." *Id.* at 297. These concerns led the district court to determine that

he is at risk to recidivate, and that he could present a danger to the community, particularly to the health of wildlife and the well-being of the land. A sentence of one day of time served would not reflect the seriousness of this offense, promote respect for the law, provide a just punishment, or afford adequate deterrence to criminal conduct.

*Id.*

The court later asked the Government to justify the proposed no-fishing restriction. The Government responded, "[E]njoying the wildlife of any state or federal lands is a privilege. And if you violate that privilege, you don't have the right, or shouldn't have the right. I think that is the purpose to not be able to enjoy the wildlife [anymore] . . . ." *Id.* at 313.

When the district court imposed the special condition, it concluded,

Because these are employment opportunities, they are subject to special scrutiny, and the Court has conducted that special scrutiny. These limitations are imposed because the Court has found that they bear a reasonably direct relationship to the crimes committed by the defendant, and they are reasonably necessary to protect the public. Further, the Court determines that this imposition, because it is imposed only for the time of the supervised release, is a condition for the minimum amount of time and to the minimum extent necessary to protect the public.

*Id.* at 321.

The district court's discussion of Mr. Rodebaugh's crimes and risk of recidivism appears to pertain to § 5F1.5(a), which states an occupational restriction must both (1) relate directly to the criminal conduct and (2) be reasonably necessary to protect the public. *See* U.S.S.G. § 5F1.5(a). In concluding the restrictions satisfied "special scrutiny," the court noted it "*ha[d] found* that they bear a reasonably direct relationship to the crimes committed by the defendant, and they are reasonably necessary to protect the public." ROA, Vol. IV at 321 (emphasis added). Its earlier discussion about Mr. Rodebaugh's crimes and risk to recidivate seems to relate to this finding.

The district court's only discussion of § 5F1.5(b) consisted of one sentence: "Further, the Court determines that this imposition, because it is imposed only for the time of the supervised release, is a condition for the minimum amount of time and to the minimum extent necessary to protect the public." *Id.* It therefore concluded the condition was minimally restrictive "because it is imposed only for the time of the supervised release." *Id.*

I would conclude the district court did not give an adequate explanation to satisfy § 5F1.5(b)'s requirement that the condition be "for the minimum time and to the minimum extent necessary to protect the public." U.S.S.G. § 5F1.5(b). "A district court's duty to specifically find that a restriction is minimally restrictive is *mandatory*." *Butler*, 694 F.3d at 1184 (emphasis added) (quotations omitted). A court must make "specific findings." *Dunn*, 777 F.3d at 1178. Simply parroting the § 5F1.5(b) language

is insufficient. An explanation, not just a conclusory statement, is necessary as to how the restriction is minimally restrictive. "Perhaps the district court would make such findings, but[] the record is not sufficient for us to make this determination in the first instance." *Id*. at 1178-79.

The Government conceded at oral argument that the district court had failed to satisfy § 5F1.5(b), though it did not concede we should remand. *See* Oral Arg. at 21:58-24:21. I would remand, however, because the district court fell short on three grounds.

First, the district court did not show it considered any less restrictive means as to time or extent. *See United States v. Wittig*, 528 F.3d 1280, 1288-89 (10th Cir. 2008) ("[A]n occupational restriction shall be imposed for the minimum time and to the minimum extent necessary to protect the public. . . . Here, there is no indication the court considered any less restrictive alternatives." (citations, quotations, and alterations omitted)); *United States v. Souser*, 405 F.3d 1162, 1167 (10th Cir. 2005) (emphasizing the mandatory nature of the district court's obligation to find that the occupational restriction is the minimum restriction necessary and vacating the condition because "nothing in the record establishes that the court considered whether the public could be equally protected by lesser restrictions"). For example, the court did not indicate why an occupational restriction on hunting and fishing as opposed to just hunting was minimally necessary. And although the district court concluded that completely prohibiting Mr. Rodebaugh's occupational hunting was *reasonably necessary* to protect the public, it did not say it was *minimally restrictive*. *See Souser*, 405 F.3d at 1167 ("Although the District Court concluded that this condition of probation would serve to protect Ms. Souser's

employer and patients, nothing in the record establishes that the court considered whether the public could be equally protected by lesser restrictions.").

Second, the district court failed to consider the effect of the occupational restriction on Mr. Rodebaugh's ability to earn a living or to pay restitution after he is released from prison. *See Dunn*, 777 F.3d at 1178 (vacating a special condition because the district court had not met its burden of finding a condition "minimally restrictive" when it was "unclear" from the record "whether the district judge even considered the effect of the [condition] on [the appellant's] prospects for future employment or his ability to pay restitution to his victims").

Third, the district court said that because the condition was imposed only for the period of supervised release, it met the minimum time and extent requirements. But this just assumes the appropriate length of time for the condition is the period of supervised release and somehow shows the minimal extent of the condition. The district court did not explain why three years would be the minimum time needed for this occupational restriction, nor does it explain that the restriction was the minimum extent necessary to protect the public.

The relevant statute and Guidelines for occupational restrictions recognize that when an inmate leaves federal prison and rejoins the community during supervised release, the opportunity to renew productive employment and make an income is a critical step. Occupational restrictions are "intended to be used to preclude the continuation or repetition of illegal activities while avoiding a bar from employment that exceeds that needed to achieve that result." U.S.S.G. § 5F1.5 cmt. background (quoting

S. Rep. No. 98-225, at 96-97 (1984)).  If occupational restrictions are needed to protect

the public, courts can and should impose them, but the individual should otherwise be

allowed to restart his or her life.  The condition "should only be used as reasonably

necessary to protect the public.  It should not be used as a means of punishing the

convicted person."  *Id.* (quoting S. Rep. No. 98-225, at 96).

The requirement for specific findings that an occupational restriction is minimally

restrictive helps ensure the district court has adequately considered whether the condition

is the least restrictive and enables the reviewing court to be satisfied the minimal

restriction standard has been fully met.  I cannot make that determination here because

the district court did not adequately explain how the § 5F1.5(b) requirements had been

met, either as to time or extent.  Therefore, "the record is insufficient to support" the

occupational restriction under § 5F1.5(b), and "we cannot conclude that the District

Court's error was harmless."  *Souser*, 405 F.3d at 1167; *see Wittig*, 528 F.3d at 1288-89.

I would remand so the district court could remedy that omission.[32]

---

[32] I would have remanded without addressing each part of the special condition challenged here (e.g., the ban on fishing for pleasure) or the question of whether the occupational restriction would be justified even in light of specific findings.  *See Butler*, 694 F.3d at 1185.

*United States v. Rodebaugh*
No. 13-1081, **BACHARACH**, J., joined by **MORITZ**, J.

Convicted on six counts under the Lacey Act, Mr. Dennis Rodebaugh was sentenced to prison for 41 months and supervised release for 3 years. The supervised-release terms include restrictions on Mr. Rodebaugh's (1) occupation (work as a hunting guide and an outfitter) and (2) hunting and fishing for pleasure. Mr. Rodebaugh appeals these restrictions. On the occupational restriction, he contends that (1) the district court failed to make specific findings and (2) the restriction is too harsh. Mr. Rodebaugh also argues that he should have been allowed to hunt and fish for pleasure while on supervised release.[1]

We reject all of these contentions. Mr. Rodebaugh forfeited his challenges to the occupational restriction, and the district court had the discretion to impose the restrictions on hunting and fishing for pleasure.

---

[1]     Mr. Rodebaugh's appeal briefs are unclear on the scope of his challenge to the content of the supervised-release terms. Most of his discussion involves the occupational restriction. In two places in his opening brief, however, Mr. Rodebaugh suggests that he may be intending to challenge the content of not only the occupational restriction, but also the restriction on hunting and fishing for pleasure. *See* Appellant's Opening Br. at 56-57 ("Restrictions that prohibit the defendant's enjoyment require special scrutiny."); *id.* at 57 ("There is no basis for the hunting and fishing restrictions."). In light of these passages, we assume for the sake of argument that Mr. Rodebaugh is intending to challenge not only the occupational restriction but also the restriction on hunting and fishing for pleasure.

I.    **The Occupational Restriction**

The challenges to the occupational restriction turn on the standard of review. In determining the appropriate standard, we face two questions:

1.    Did Mr. Rodebaugh object in district court to the occupational restriction?

2.    If not, should we excuse Mr. Rodebaugh's failure to preserve the objection based on the government's handling of the issue?

On the first question, we conclude that Mr. Rodebaugh did not make this objection in district court. On the second question, we decline to excuse Mr. Rodebaugh's failure to preserve the objection based on how the government handled the issue.

A.    **Mr. Rodebaugh's Forfeiture**

Mr. Rodebaugh challenges the occupational restriction based on the lack of specific findings and the content. In our view, Mr. Rodebaugh failed to specifically object in district court to any aspect of the occupational restriction.

All agree that Mr. Rodebaugh forfeited his challenge on the specificity of the findings. For example, he admitted in oral argument that he was at fault for the district court's lack of specificity. And Judge Matheson acknowledges that he "cannot find . . . where Mr. Rodebaugh preserved an objection to the district court's failure to make specific findings." Judge Matheson's Op. at 39.

Our disagreement with Judge Matheson involves only the content-based challenge to the occupational restriction. This disagreement relates to the way that we interpret three sentences in Mr. Rodebaugh's objection to the presentence report:

> The Defendant does not object to the time served recommendation nor community service, however, he does object to preventing the Defendant from fishing and hunting or accompanying anyone hunting or fishing anywhere in the United States. The Defendant has or will lose his Colorado outfitter's license and Federal permits. The Defendant derives his only pleasure from hunting (now limited to non-firearm hunting) and fishing in the secluded White River valley or elsewhere (Kentucky).

R., vol. 2, at 677 (footnote omitted). In our view, Mr. Rodebaugh was objecting to the restriction only insofar as it would take away his opportunity to hunt or fish for pleasure. *Id.* Thus, the district court addressed the occupational restriction with this understanding of Mr. Rodebaugh's concern.

Judge Matheson states that Mr. Rodebaugh may have preserved an appeal point on the content by objecting to the prohibition on "accompanying" others to hunt or fish. Judge Matheson's Op. at 39-40. That objection could theoretically encompass part of Mr. Rodebaugh's business (called "bugle calls"), where Mr. Rodebaugh accompanied other hunters. R., vol. 3, at 1220, 1269; R., vol. 7, at 88. Thus, generously construed, Mr. Rodebaugh's statement may have been broad enough to

encompass the prohibition on continued participation in this part of the business.

But our case law requires more to preserve an appeal point. Under that case law, "an objection must be 'definite' enough to indicate to the district court 'the precise ground' for a party's complaint. . . . Absent a specific objection, the district court is deprived of the opportunity to correct its action in the first instance." *United States v. Winder*, 557 F.3d 1129, 1136 (10th Cir. 2009) (citations omitted). It is not enough for a party to make a remark to the district court that is related to the eventual appeal point. *Okland Oil Co. v. Conoco Inc.*, 144 F.3d 1308, 1314 n.4 (10th Cir. 1998). Thus, we have held that an appeal point is not preserved by vague, all-encompassing statements that fail to alert the district court to the issue eventually raised on appeal. *See Ecclesiastes 9:10-11-12, Inc. v. LMC Holding Co.*, 497 F.3d 1135, 1141-42 (10th Cir. 2007) (holding that a claimant did not preserve its appeal point on dismissal for a failure to prosecute though the claimant argued in district court that dismissal would be improper on any ground other than the merits).

Under our case law, Mr. Rodebaugh's objection to the presentence report was not specific enough to preserve a challenge to the occupational restriction's content. Mr. Rodebaugh mentioned a hardship from a prohibition on accompanying other hunters, but quickly explained that his concern involved "his only pleasure" in life: hunting and fishing. R., vol.

2, at 677. With that explanation, Mr. Rodebaugh added that he would "lose his Colorado outfitter's license and Federal permits" independently of the supervised-release terms. *Id.* Thus, the district court had little reason to think Mr. Rodebaugh was objecting to any aspect of the occupational restriction.[2] In these circumstances, we conclude that Mr. Rodebaugh failed to preserve an objection to the content of the occupational restriction.

Because Mr. Rodebaugh failed to preserve his objections to the occupational restriction, he forfeited the issue. *United States v. Cornelius*, 696 F.3d 1307, 1319 (10th Cir. 2012). With forfeiture, we would ordinarily review the issue under the plain-error standard of review. *United States v. Battles*, 745 F.3d 436, 445 n.9 (10th Cir. 2014). But Mr. Rodebaugh did not argue plain error in the appeal. As a result, we would generally decline to review Mr. Rodebaugh's challenges to the occupational restriction. *See United States v. Lamirand*, 669 F.3d 1091, 1098-1100 n.7 (10th Cir. 2012).

---

[2]     Judge Matheson points out that the district court referred to "special scrutiny" for the occupational restriction. Judge Matheson's Op. at 38. Based in part on this reference, Judge Matheson rejects the government's invited-error argument, reasoning that Mr. Rodebaugh's statement did not cause the district court to do something that it was not otherwise inclined to do. *Id.* For the sake of argument, we can assume that Judge Matheson is correct, for we draw no conclusions on the government's theory of invited error. But the issue of forfeiture focuses on the specificity of the defendant's objection, not what the district court said. *See United States v. Ivy*, 83 F.3d 1266, 1297 (10th Cir. 1996) ("We have repeatedly held that if a defendant fails to object to his presentence report, he waives his right to challenge the district court's reliance on it. . . .").

**B.** **Our Discretion to Excuse Mr. Rodebaugh's Forfeiture Based on the Government's Handling of the Issue: "Waiver of the Waiver"**

We have sometimes applied a principle called "waiver of the waiver." Judge Matheson would apply this principle here, concluding that the government waived or forfeited any argument that Mr. Rodebaugh had failed to preserve the issue. For the sake of argument, we can assume that (1) the "waiver of the waiver" principle can be applied to a defendant's forfeiture (as well as a waiver)[3] and (2) the government's handling of the issue could be considered a waiver or forfeiture of Mr. Rodebaugh's failure to preserve his challenges to the occupational restriction.

But even if the government had somehow waived or forfeited Mr. Rodebaugh's forfeiture, we would be left with dueling "waivers/forfeitures." Mr. Rodebaugh would have forfeited the challenge by failing to speak up in district court, and the government would have waived or forfeited its challenge to Mr. Rodebaugh's forfeiture by failing to speak up in the appeal. In these circumstances, we would need to decide whose waiver/forfeiture to overlook, for the "waiver of the waiver" principle is discretionary, not mandatory. *See United States v. McGehee*, 672 F.3d 860, 873-74 n.5 (10th Cir. 2012); *see also* Judge Matheson's Op. at 44 (acknowledging that we have discretion to overlook the government's

---

[3]     *See United States v. Prado*, 743 F.3d 248, 251 (7th Cir. 2014) (applying the "waived waiver" doctrine to claims that were forfeited rather than waived).

waiver of Mr. Rodebaugh's failure to preserve his argument involving the lack of specific findings).

We have two choices:

1. Excuse Mr. Rodebaugh's forfeiture because the government did not point out that Mr. Rodebaugh had forfeited the challenge.

2. Recognize Mr. Rodebaugh's forfeiture regardless of how the government handled the preservation issue.

We opt for the second choice; Judge Matheson would opt for the first.

In deciding how to exercise our discretion, we begin by considering what Mr. Rodebaugh said in district court. As discussed above, Mr. Rodebaugh stated there that he (1) wanted to continue hunting and fishing for pleasure and (2) would soon lose his outfitter's license and federal permits regardless of the restrictions imposed by the district court. R., vol. 2, at 677. Thus, the district court addressed the occupational restriction with an understanding that Mr. Rodebaugh's sole concern was his ability to continue hunting and fishing for pleasure.

The government's alleged "waiver/forfeiture" was different. The government did not address forfeiture in its appeal brief, but made an even more pointed contention in oral argument, stating that Mr. Rodebaugh had "invited" the error by representing that he would lose his outfitter's license and federal permits regardless of what the court did.[4] Thus, as we decide

---

[4] Judge Matheson states that we "prompted" the government to assert invited error. Judge Matheson's Op. at 41. Prior to oral argument, we asked

this appeal, we know that the government objects to our consideration of Mr. Rodebaugh's challenge to the occupational restriction.

The district court had no such knowledge; it knew only that Mr. Rodebaugh had viewed the occupational restriction as immaterial because of the impending loss of his outfitter's license and federal permits.

Judge Matheson does not question our awareness of the government's position as we decide the issue. Though Judge Matheson would reject the government's argument on invited error, we know the government objects on the ground that Mr. Rodebaugh did not preserve the issue; by definition, the assertion of "invited error" meant that the government was attributing any possible error to Mr. Rodebaugh's statement that he was going to lose the license and permits that are required for work as an outfitter (independently of any supervised-release terms).[5] *See Black's Law Dict.* at 955 (10th ed., Bryan A. Garner 2014) (defining the "invited error" doctrine

_____

the parties to "be prepared to address" the issue of invited error at oral argument. Order at 1 (Apr. 30, 2015). The government did prepare, as we asked, and argued to us that Mr. Rodebaugh had invited the error made by the district court. Though the impetus may have been our order, the argument was the government's, not ours.

[5] Judge Matheson states that we are expanding the invited error doctrine. Judge Matheson's Op. at 39. But we are not drawing any conclusions on the invited error doctrine. We are simply noting that by invoking the invited error doctrine, the government was—in substance— arguing that Mr. Rodebaugh had failed to preserve his challenge in district court.

as "[t]he rule that a litigant cannot complain on appeal of an error at trial that he himself caused or provoked").[6]

Disregarding our knowledge of the government's present position, Judge Matheson gives two reasons to exercise discretion in favor of Mr. Rodebaugh and against the government: (1) the district court's duty to make specific findings is mandatory, and (2) the government admitted in oral argument that the district court had failed to make the necessary findings. Judge Matheson's Op. at 44. In our view, these reasons beg the question of whose forfeiture to overlook.

It is true, as Judge Matheson says, that the district court's duty to make specific findings is mandatory. *United States v. Butler*, 694 F.3d 1177, 1184 (10th Cir. 2012). But the mandatory nature of the duty goes to the merits; it doesn't help us determine how to exercise our discretion. After all, there are many mandatory requirements that have been considered "waived" or "forfeited." *See, e.g.*, *United States v. Williamson*, 53 F.3d 1500, 1527 (10th Cir. 1995) (applying the plain-error standard because the defendant failed to object in district court even if the court had violated the "mandatory requirements" in Federal Rule of Criminal Procedure 32(c)(3)(D)).

---

[6]     Judge Matheson states that the government spent only 25 seconds to argue for invited error. Judge Matheson's Op. at 42. Regardless of how long the argument took, however, we know the government attributes any possible error on the occupational restriction to Mr. Rodebaugh's statements in district court.

Judge Matheson relies on the district court's failure to carry out a mandatory duty: to make specific findings supporting the occupational restriction. Based on that failure, Judge Matheson deems it appropriate to excuse Mr. Rodebaugh's forfeiture on his challenge to the specificity of the findings. We respectfully disagree with this reasoning. The government acknowledged that the district court had failed to make specific findings, but attributed the omission to Mr. Rodebaugh's representation that he would soon lose his outfitter's license and federal permits regardless of what the court did. If Mr. Rodebaugh had spoken up, the district court would have been alerted to the occupational restriction's potential impact. In these circumstances, we believe it is inequitable to excuse Mr. Rodebaugh's forfeiture based on the district court's failure to make specific findings.

Judge Matheson rhetorically asks, "Inequitable as to whom?," answering, "Not Mr. Rodebaugh, who was entitled to specific findings. Not the Government, which agrees the district court should have made them. Not the district court, which erred." Judge Matheson's Op. at 44 n.27. Respectfully, we think this approach fails to consider Mr. Rodebaugh's role in contributing to the lack of findings. When the district court imposed the occupational restriction, Mr. Rodebaugh had just said that he would lose his Colorado outfitter's license and federal permits independently of any supervised-release restrictions. R., vol. 2, at 677.

Notwithstanding Mr. Rodebaugh's apparent lack of concern over an occupational restriction, Judge Matheson states that Mr. Rodebaugh "was entitled to specific findings." Judge Matheson's Op. at 44 n.27. But our issue doesn't involve the merits; it involves how to exercise our discretion when faced with dual waivers/forfeitures.

Though Judge Matheson would exercise discretion in a different way, he agrees that Mr. Rodebaugh waived the argument about a lack of specific findings. Judge Matheson's Op. at 39. The government apparently didn't catch that waiver when briefing the issue, but later attributed the district court's error to Mr. Rodebaugh. In contrast, Mr. Rodebaugh *never* alerted the district court to any concern with the specificity of the findings.

In these circumstances, we believe it is indeed inequitable to excuse Mr. Rodebaugh's forfeiture based on the district court's failure to make specific findings. *See United States v. McGehee*, 672 F.3d 860, 873-74 n.5 (10th Cir. 2012) (declining to apply "waiver of the waiver" when the government did not argue in its appellate brief that the defendant had failed to preserve the challenge, reasoning that the government had raised the preservation issue in oral argument and the defendant had declined to argue "waiver of the waiver"). Thus, we will not excuse Mr. Rodebaugh's forfeiture based on the government's eventual invocation of "invited error" rather than "forfeiture."

## C.    The Effect of the Defendant's Forfeiture

In light of Mr. Rodebaugh's forfeiture, we would ordinarily apply the plain-error standard of review. *See* p. 5, above. But Mr. Rodebaugh has not argued plain error on appeal. As a result, we decline to entertain Mr. Rodebaugh's forfeited challenge to the adequacy of the district court's findings. *See* p. 5, above. In these circumstances, we reject the challenge involving specificity of the findings.

## II.    The Restrictions on Hunting and Fishing for Pleasure

Mr. Rodebaugh also challenges the content of the restrictions on hunting and fishing for pleasure. On this challenge, we apply the abuse-of-discretion standard. *United States v. Begay,* 631 F.3d 1168, 1170 (10th Cir. 2011). In applying this standard, we conclude that the district court had discretion to restrict hunting and fishing for pleasure.

The conviction grew out of 20+ years of wildlife-related hunting violations, which involved the unlawful taking of numerous deer and elks. The district court pointed out that Mr. Rodebaugh had failed to take responsibility for his actions, concocting falsehoods to conceal his crimes. R, vol. 4 at 296–97. Based on these actions, the district court found that Mr. Rodebaugh was "at risk to recidivate" and could present a danger to the community. *Id.* at 297.

Mr. Rodebaugh does not challenge these findings, and they supported the prohibition on hunting and fishing. In these circumstances, we

conclude that the district court acted within its discretion. Thus, on the challenge involving the content of the restrictions, we affirm.

**III.  Conclusion**

Mr. Rodebaugh forfeited the challenges to the occupational restriction by failing to specifically object in district court. Even if the "waiver of the waiver" principle were otherwise applicable, we would decline to apply this principle here. Thus, we reject the challenges involving the occupational restriction.

We also reject the challenge involving the content of the restrictions on hunting and fishing for pleasure. These restrictions fell within the district court's discretion because of the risk of recidivism.

As a result, we affirm on the challenges involving the supervised-release restrictions.