**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 14, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

JOHN LEROY MILNE,

    Defendant - Appellant.

No. 18-2037
(D.C. No. 2:17-CR-01923-RB-1)
(D.N.M.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BRISCOE**, **KELLY**, and **MORITZ**, Circuit Judges.
_____

Defendant-Appellant John Leroy Milne was convicted by a jury of conspiracy to

distribute 100 kilograms or more of marijuana (Count 1), 21 U.S.C. § 846, and

possession with intent to distribute 100 kilograms or more of marijuana (Count 2),

21 U.S.C. § 841(a)(1), (b)(1)(B), and 18 U.S.C. § 2.  He was sentenced to concurrent 78-

month terms of imprisonment for each count, followed by four years of supervised

release for each count also to run concurrently.  1 R. 270–71.  On appeal, he challenges

the district court's decisions (1) denying his motion to suppress; (2) allowing the physical

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of
the case, res judicata, and collateral estoppel.  It may be cited, however, for its persuasive
value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

evidence to be brought in the courtroom and admitting evidence that Mr. Milne had heroin in his wallet when arrested; (3) denying his motion for judgment of acquittal; and (4) imposing an obstruction of justice sentencing enhancement, U.S.S.G. § 3C1.1. Our jurisdiction arises under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a)(2), and we affirm.

## Background

Mr. Milne and a codefendant, Manuel Pavón-Rodriguez, were indicted after Border Patrol agents found bundles of marijuana in the rear cargo area of Mr. Milne's vehicle and Mr. Pavón, an illegal alien, hiding in the back seat.

A.  The Suppression Hearing

Mr. Milne moved to suppress the bundles of marijuana and the presence of Mr. Pavón, arguing that Border Patrol Agent Matthew Defayette pulled him over without reasonable suspicion and that all evidence derived from his encounter was derivative evidence. See 1 R. 22–27. In the alternative, Mr. Milne argued that even if he were not seized initially, the encounter developed into a seizure without reasonable suspicion. Id. at 25. The district court held a two-day hearing on the suppression motion. See 3 R. 5–225.

Agent Defayette testified that on the morning of June 23, 2017, he was stationed in his vehicle at the intersection of State Line Road and Highway 80 just south of Rodeo, New Mexico. Id. at 11, 14. Just before 8:00 a.m., he observed Mr. Milne pass him headed northbound on Highway 80 in a Ford Explorer with tinted windows without any visible license plates. Id. at 14, 23. Agent Defayette further testified that he got behind

2

Mr. Milne's vehicle and followed it northbound on Highway 80 for about a mile-and-a-half to two miles before the vehicle pulled over at the Rodeo Tavern. Id. at 15. Mr. Milne did not park in a parking space perpendicular to both the Rodeo Tavern and Highway 80, but rather parallel to Highway 80. Id. at 18. Agent Defayette parked approximately two car lengths behind Mr. Milne, facing the same direction, and he alerted his dispatch that he was conducting a "welfare check" on Mr. Milne's vehicle. Id.

According to Agent Defayette, he turned on his rear-facing emergency lights to warn oncoming motorists of his presence on the side of the road, but he did not turn on his siren or his front-facing emergency lights while he was driving or parking behind Mr. Milne. Id. 19, 49, 189. On cross-examination, Mr. Milne's counsel questioned the agent about a photograph taken an hour after his encounter with Mr. Milne that clearly shows his front-grille lights illuminated. Id. at 43–45. Agent Defayette testified on redirect that, although he did not remember turning his lights on, he was sure that he did not turn them on prior to his encounter with Mr. Milne. Id. at 51.

Upon pulling over, Mr. Milne exited his vehicle and approached the driver's side of the agent's vehicle. Id. at 18–19. Agent Defayette asked Mr. Milne if everything was okay, to which Mr. Milne responded that he was stopping to get something to drink. Id. at 19. The agent thought Mr. Milne's response "kind of odd," as the Rodeo Tavern was neither a grocery store nor open at that time in the morning. Id. at 19–20. In the ensuing colloquy, Agent Defayette thought that several responses of Mr. Milne were odd: (1) Mr. Milne indicated that he was traveling from Benson, Arizona to Phoenix, Arizona, but Rodeo is east of both Benson and Phoenix; (2) Mr. Milne claimed he was looking for

3

work in Rodeo, but Rodeo is a small town lacking many opportunities for work; and (3) Mr. Milne appeared nervous and was sweating throughout the conversation, but the weather was not hot at the time.  Id. at 20–21.  According to Agent Defayette, the tone of the conversation was "normal."  Id. at 21.

Agent Defayette asked Mr. Milne if he was transporting anything illegal or if anyone else was inside the vehicle, and if he could look inside.  Id.  Mr. Milne declined. When asked for identification, Mr. Milne told the agent that he lacked identification, but he gave his name and date of birth.  Id. at 22.  As Agent Defayette was about to run a records check, Border Patrol Agents Roger Evan Jay, Jr., and Rene Rocha arrived.  Id. at 22, 47, 56.  Agent Jay informed Agent Defayette that Mr. Milne had a temporary license plate taped on the inside of the back glass of his vehicle, but Agent Defayette testified that it was difficult to see because of the tinted glass.  Id. at 23.  According to Agent Defayette, Mr. Milne offered to retrieve the temporary license plate out of the window.[1]  Id. at 23–24; 35.  Mr. Milne then opened the glass portion of his vehicle's back hatch about four inches "just so he could get his hand in there," at which point Agent Defayette noticed numerous burlap sacks in the vehicle's rear cargo area.  Id. at 24. Agent Defayette asked him about the sacks, and Mr. Milne told him that they were "bales."  Id. at 25.  Agent Defayette testified that such sacks are normally used in narcotics smuggling.  Id. at 24.  Agent Defayette then asked him if there was anyone else

---

[1]  Agent Jay testified at the suppression hearing that he asked Mr. Milne if he could pull out the temporary license plate, to which Mr. Milne consented.  3 R. 61.

4

inside the vehicle, to which Mr. Milne responded that there was a person lying in the back seat. Id. at 25. The agents subsequently arrested Mr. Milne. Id. at 25–26.

Agent Jay also testified at the suppression hearing. Germane to this appeal, he testified that he activated his rear-facing emergency lights when he and Agent Rocha arrived at the Rodeo Tavern. Id. at 57, 67. According to Agent Jay, he and other Border Patrol agents typically activate their rear-facing emergency lights before exiting their vehicles near a road as a "precaution" to alert oncoming vehicles of their presence. Id. at 57–58. He also testified that he observed Agent Defayette's rear-facing emergency lights but did not notice any activated front-facing lights. Id. at 59.

Contrary to Agent Defayette's testimony, Mr. Milne testified that Agent Defayette turned on his front-grille emergency lights, forcing Mr. Milne to pull over. Id. 145–47, 177. He explained that he parked parallel to Highway 80 rather than in a parking space because Agent Defayette had pulled him over, and that he was aware that the Rodeo Tavern was closed. Id. at 149. He also denied stating that he stopped for a drink, and he testified that if he were thirsty, he would have gone to a nearby grocery store. Id. at 150.

The district court found that the Border Patrol agents were more credible than Mr. Milne, and that it would resolve any factual disputes in favor of the Border Patrol agents' testimony. United States v. Milne, No. CR 17-1923 RB, 2017 WL 4675745, at *1 (D.N.M. Oct. 16, 2017). Accordingly, it found that Mr. Milne pulled over voluntarily and exited his vehicle of his own accord. Id. at *5. It further found that Mr. Milne was free to leave his encounter with Agent Defayette. Id. Next, it reasoned that Mr. Milne had volunteered suspicious answers to Agent Defayette's questions such that, even if Mr.

Milne was detained for Fourth Amendment purposes when Agents Jay and Rocha arrived, such detention was supported by reasonable suspicion. Id. at *6. Finally, it found that Mr. Milne voluntarily retrieved his temporary license plate, which allowed the officers to observe the burlap sacks in his vehicle. Id. at *7. The sacks, in conjunction with Mr. Milne's statements that they contained "bales" and that there was a man lying down in his back seat, created probable cause to believe that the vehicle contained evidence of a crime. Id. Because "[a]t no stage of the interaction did Border Patrol violate Messrs. Milne and Pavón's Fourth Amendment rights," the court denied Mr. Milne's motion to suppress. Id.

B.      The Trial

Prior to trial, the government informed the court that it intended to display the marijuana seized from Mr. Milne's vehicle, 3 R. 231–32, which was in 11 duct-taped bundles.[2] 4 R. 143, 157. It also informed the court that the Border Patrol had destroyed the burlap sacks surrounding the bundles pursuant to agency practice. 3 R. 231–32. Mr. Milne objected to their admission at trial, arguing that "[w]e don't know if the smell is going to be the same as it was" at the time of his arrest, and that he did not know how the government ascertained the contents of the bundles. 4 R. 63–64. The court overruled his

---

[2] In his brief, Mr. Milne characterizes the marijuana as "sealed," both in the courtroom and in his vehicle when covered by the burlap sacks. Aplt. Br. at 16, 30, 39. Such terminology is misleading. The record and the parties' briefs make clear that the marijuana was divided into "bundles," each wrapped in duct tape, and that these bundles were surrounded by burlap while in the rear cargo area of Mr. Milne's vehicle. See, e.g., United States v. Milne, 297 F. Supp. 3d 1146, 1148 (D.N.M. 2017); Aplt. Br. at 16, 51–52; Aplee. Br. at 7, 13; 1 Supp. R. 42–43.

objection, reasoning that the marijuana was relevant to Mr. Milne's knowledge of the bundles' contents, that Mr. Milne could argue to the jury that the marijuana's smell had changed over time, and that additional testimony would elucidate the government's testing methodology.  Id. at 64.

At trial, Agent Defayette testified as he did at the suppression hearing, id. at 46–62, 65–80, including how Mr. Milne retrieved his temporary license plate.[3]  Id. at 57.  In addition, the government brought the bundles of marijuana into the courtroom during his testimony.  Id. at 65.  Agent Defayette testified that the bundles were the same bundles that he recovered from Mr. Milne's vehicle, but that they were missing their burlap covering.  Id. at 66.  He also testified that marijuana smells stronger in smaller areas than larger ones.  Id.  Supervisory Border Patrol Agent Edward Marshall also testified that the smell of marijuana was stronger without the burlap sacks, and that the sacks altered the odor in degree, not in kind.  Id. at 113, 115–16.

Counsel for Mr. Pavón, Mr. Milne's codefendant, sought to cross-examine Agent Defayette about 0.2 grams of heroin found in Mr. Milne's wallet after Mr. Milne's arrest.  Mr. Pavon's counsel argued that the evidence was relevant to Mr. Milne's credibility, while Mr. Milne argued that it was unduly prejudicial compared to its probative value.  Id. at 71–72.  The court allowed the questions pursuant to Fed. R. Evid. 404(b) over Mr.

---

[3]  Agent Rocha also testified that Mr. Milne had trouble pulling out the temporary license plate, as he did so by opening only the "top part of the window, the hatch" and reaching up to about his elbow.  4 R. 93.

Milne's objection, id. at 73, 77, but it included in its final charge to the jury that Mr. Milne was "not on trial for any act, conduct, or crime not charged in the Indictment."[4] Id. at 442.

Agent Jay testified at trial that there was a "very strong" marijuana odor in Mr. Milne's vehicle at the time of the search. Id. at 85. He also testified that Mr. Pavón was wearing camouflage when the agents found him in the back seat of Mr. Milne's vehicle, "which is notorious . . . for smuggling of narcotics." Id. at 86.

The government also presented evidence that the bundles contained about 246 pounds of marijuana, or over 111 kilograms. Id. at 61, 137. Drug Enforcement Agency (DEA) Special Agent Billy Ray Hopkins testified that, pursuant to DEA policy, he sent 11 samples to a laboratory to test for narcotics. Id. at 137. All 11 samples came from one bundle, id. at 138, and all tested positive for marijuana. Id. at 134, 193–99.

---

[4] The cross-examination regarding the heroin consisted of the following line of questioning:

> Q.  [W]hen the other defendant, Mr. Milne, was searched, you found something in his wallet, didn't you?
> A.  Yes, sir.
> Q.  And it was a tiny amount that was field-tested for positive for [sic] heroin?
> A.  Yes, sir.
> Q.  And it was like, what, .2 grams or a very small amount?
> A.  Yes, sir. It was a small amount.

4 R. at 77–78.

The government also called DEA Special Agent Joseph Montoya, who testified as a drug-investigations expert. Id. at 217. He provided information about "backpackers" and drug couriers, including their method of transportation, their frequent use of camouflage, the value of different controlled substances, and favored drug-smuggling routes, including Highway 80. Id. at 214–15, 217–226.

After the government rested, Mr. Milne moved for a judgment of acquittal on both charges, arguing that no reasonable jury could find that (1) Mr. Milne conspired to commit a crime; (2) the offenses involved at least 100 kilograms of marijuana; and (3) Mr. Milne knowingly possessed marijuana. Id. at 240–41. The district court denied the motion as to the conspiracy charge, id. at 243, and it took the motion as to the quantity of marijuana under advisement. Id. at 245.

Mr. Milne testified that he had recently divorced, that he was homeless, and that he was recently convicted of amphetamine possession and an escape charge. Id. at 250. He had been working as a handyman, and he testified that he had driven to southern Arizona and New Mexico in search of handyman or ranch work. Id. at 251–52. On the day before his arrest, he drove east on Interstate 10 ("I-10") from Tucson, Arizona, through Benson and Willcox, Arizona, then south onto Highway 80 through Rodeo to Apache, Arizona, before returning to Willcox for the night. Id. at 254–61. He testified that the following day, he drove back east on I-10. He observed at the intersection of I-10 and Highway 80 three men standing in front of a temporary tent selling rugs and paintings. Id. at 262, 264. He asked them about work opportunities, and they told him that they needed feed delivered from a ranch house at the south end of Rodeo to a house

9

on Highway 80 at the north end of Rodeo. Id. at 264–65. He agreed and drove south on Highway 80 until he came to the ranch house, where he testified he saw five to six "regular guys" wearing jeans or cargo pants, a few wore cowboy hats, and one wore a baseball cap. Id. at 269–70. According to Mr. Milne, he opened his trunk, and the men loaded burlap sacks into the back of his vehicle without his help. Id. at 271–72. He described the sacks as smelling "dirty" and "musty" but not like the burning marijuana he had smelled at concerts he had attended. Id. at 272. After the men loaded the sacks, Mr. Milne testified that a Spanish-speaking man — Mr. Pavón — entered his vehicle and lay down. Id. at 273. Mr. Milne assumed the man was a ranch hand who would help to unload the bales, and he did not object or ask any questions as to the man's presence. Id. at 273–74. Mr. Milne then recounted pulling over for Agent Defayette. Id. at 275–79.

Mr. Pavón also testified. He testified that he paid a smuggler to take him from Agua Prieta, Mexico, to Phoenix. Id. at 338–40. He traveled with a group from Mexico to the driveway of the ranch house in Rodeo, where Mr. Milne arrived in his Ford Explorer. Id. at 341–43. Like Mr. Pavón, the other members of the group were wearing camouflage. Id. at 346. When Mr. Milne arrived, some members of his group collected sacks from behind shrubs and loaded them into Mr. Milne's vehicle, and Mr. Pavón's smuggler told him to get in Mr. Milne's vehicle. Id. at 343. According to Mr. Pavón, Mr. Milne told him to lie down. Id. Mr. Pavón testified that "you couldn't really smell" the marijuana in the vehicle. Id. at 344. He further testified that Mr. Milne told him, "a moment," after he pulled over at the Rodeo Tavern, which Mr. Pavón interpreted to mean that he should wait in the vehicle. Id. at 351.

10

At the close of Mr. Milne's case, the government informed the court that it had, in the interim, tested each bundle, and it was prepared to call a witness to testify as to their contents. Id. at 364–65. Mr. Milne objected, arguing that the government already had an opportunity to present such evidence. Id. at 365–66. He then renewed his motion for acquittal. Id. at 366. The court held that it would not allow the government to reopen, and it allowed the jury to render a verdict. Id. at 367–79.

The jury acquitted Mr. Pavón, but not Mr. Milne. Id. at 511. Mr. Milne filed a renewed motion for mistrial,[5] 1 R. 160, which the court denied. Id. at 215. At sentencing, the district court accepted the government's argument that Mr. Milne's offense level should include a two-level enhancement for obstruction of justice because of perjured testimony. The district court explained that Mr. Milne "was not truthful in his testimony pretty much from the time that he left Phoenix until he was arrested," and that "he was misleading the jury" with respect to his reasons for being in Rodeo and his purported ignorance as to the marijuana and the purpose of Mr. Pavón's presence in his vehicle. 4 R. 526.

**Discussion**

Mr. Milne raises four issues on appeal. We consider each in turn.

---

[5] Mr. Milne had filed a motion for mistrial during trial, arguing that government agents had stored the marijuana bundles adjacent to the courtroom, where they "loudly" opened and field-tested them, in a manner that allowed jurors to smell them upon exiting the courtroom and that "significantly altered an admitted exhibit." See 1 R. 161–62. The court took the matter under advisement and modified the jury instructions to mitigate any potentially prejudicial effects. 4 R. 421–35.

A.      Motion to Suppress

Whether and when a defendant was unreasonably "seized" under the Fourth

Amendment is a question of law we review de novo. United States v. Hernandez, 847

F.3d 1257, 1263 (10th Cir. 2017). However, on appeal from the denial of a motion to

suppress, we view the evidence in the light most favorable to the district court's ruling,

id., and we accept its findings of fact and determinations of witness credibility unless

clearly erroneous. United States v. Chavez, 534 F.3d 1338, 1343 (10th Cir. 2008). A

district court clearly errs if its findings lack support in the record, or, "after reviewing all

the evidence, we are left with a definite and firm conviction that a mistake has been

made." United States v. Cash, 733 F.3d 1264, 1273 (10th Cir. 2013) (quoting United

States v. Tafoya, 557 F.3d 1121, 1126 (10th Cir. 2009)).

The Fourth Amendment prohibits unreasonable seizures by the government. U.S.

Const. amend. IV. A seizure only occurs when an officer, "by means of physical force or

show of authority, has in some way restrained the liberty of a citizen." Terry v. Ohio,

392 U.S. 1, 19 n.16 (1968). In the absence of physical force, a seizure occurs only upon a

showing that (1) an officer displayed his authority, and (2) the citizen submitted to such

show of authority. United States v. Salazar, 609 F.3d 1059, 1064 (10th Cir. 2010).

Because the government concedes that Agent Defayette lacked reasonable

suspicion to pull over Mr. Milne's vehicle,[6] the sole issue is whether Mr. Milne pulled

---

[6] The stopping of a vehicle, even if brief, constitutes a seizure, Delaware v. Prouse, 440 U.S. 648, 653 (1979), and must be evaluated for reasonableness. Such evaluation "depends on a balance between the public interest and the individual's right to personal

12

over voluntarily. Whether Agent Defayette turned on his front-grille emergency lights is highly relevant. Mr. Milne contends he did not pull over voluntarily, but in response to Agent Defayette's emergency lights. In support, he relies upon the following evidence: (1) he stopped in the parking lot of a closed restaurant; (2) he parked on the side of and parallel to Highway 80 rather than in a parking space; and (3) the photograph that clearly shows Agent Defayette had activated his front-grille emergency lights. Aplt. Br. at 34–35. Undoubtedly, such evidence plausibly supports his account. But the district court heard testimony that contradicted his account, and it credited that testimony over his testimony. Agent Defayette unequivocally denied that he had activated his front-grille emergency lights prior to stopping behind Mr. Milne, and the other agents testified that they did not notice his front-grille emergency lights activated. In addition, Mr. Milne's unprompted exiting of his vehicle belied his contention that he had been unconstitutionally seized. Faced with two plausible views of the evidence, the district court credited the testimony of the agents, which was consistent, and we cannot find clear error. The denial of the suppression motion must be upheld.

---

security free from arbitrary interference by law officers." United States v. Brignoni-Ponce, 422 U.S. 873, 878 (1975). Because Border Patrol agents serve a "special function" of preventing illegal alien traffic and contraband smuggling, they lack authority to enforce traffic laws. Id. at 883 & n.8. We have long held that a Border Patrol agent may stop a vehicle only upon reasonable suspicion that the vehicle is involved in illegal trafficking or smuggling. See United States v. Cantu, 87 F.3d 1118, 1121–22 (10th Cir. 1996).

13

B.    Evidentiary Decisions

We review a district court's decision to admit or exclude relevant evidence under Fed. R. Evid. 403 for an abuse of discretion. United States v. Archuleta, 737 F.3d 1287, 1292 (10th Cir. 2013). "A district court abuses its discretion when it renders an arbitrary, capricious, whimsical, or manifestly unreasonable judgment." United States v. Silva, 889 F.3d 704, 709 (10th Cir. 2018) (quoting Ralston v. Smith & Nephew Richards, Inc., 275 F.3d 965, 968 (10th Cir. 2001)).

Mr. Milne argues that the district court abused its discretion regarding the bundles of marijuana because the prejudicial effect of the bundles without their burlap sacks substantially outweighed their probative value. Given the importance of knowledge in this case, Mr. Milne argues that because the smell was stronger in court than in his vehicle, the jury's conclusion as to his knowledge was affected. Mr. Milne also challenges the relevance of the marijuana's smell, as he only testified to knowing the smell of burning marijuana, a point further bolstered by the fact that he described the bundles' smell as "dirty" and "musty."[7]

Mr. Milne's arguments are not persuasive. Under Fed. R. Evid. 403, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by"

---

[7] Mr. Milne also cites a Seventh Circuit case in which the court held open containers of marijuana were unfairly prejudicial. Aplt. Br. at 40–41 (citing United States v. Garcia, 986 F.2d 1135, 1141–42 (7th Cir. 1993)). However, the Seventh Circuit did not find the marijuana's odor per se prejudicial, but rather that the district court erred by allowing the marijuana to remain in the courtroom and uncovered throughout the defendant's case-in-chief. Garcia, 986 F.2d at 1141–42.

certain factors, including unfair prejudice and misleading the jury. Fed. R. Evid. 403. As the government correctly notes, this court has held that the admission of actual drug evidence generally is not more prejudicial than probative, and that deficiencies of the evidence speak to its weight, not its admissibility. Aplee. Br. at 28; see also United States v. Thomas, 749 F.3d 1302, 1310 (10th Cir. 2014). Here, the smell and appearance of the bundles — the same bundles recovered from Mr. Milne's vehicle — were highly probative both as to whether Mr. Milne was aware of the nature of his cargo, and as to whether the untested bundles in fact contained marijuana. Further, Agent Jay testified that he smelled marijuana in Mr. Milne's vehicle, 3 R. 63, and Agent Marshall testified that the burlap sacks only altered the pungency, not the nature of the odor. 4 R. 113, 115–16. Witnesses also testified that the bundles likely smelled stronger without the burlap sacks, thereby allowing the jury to discount the probative nature of the smell if it chose to do so. Aplee. Br. at 27–28. In short, this issue was for the jury, which was aided by the physical evidence, and the district court did not abuse its discretion in allowing the contraband to be present.

Mr. Milne also argues that the court erred by allowing Mr. Pavón's attorney to question Mr. Milne about the heroin on his person at the time of his arrest. He characterizes the heroin as either irrelevant, highly prejudicial, or impermissible propensity evidence. Aplt. Br. at 41–44. The government counters that it was relevant to show absence of mistake and intent to distribute marijuana. Aplee. Br. at 34. In the alternative, it argues that its introduction was harmless because the heroin played a minor role at trial, Mr. Milne volunteered that he was recently convicted for amphetamine

15

possession, which is arguably more prejudicial than Mr. Pavón's questioning, the court

mitigated any risk of unfair prejudice through its limiting instruction, and the evidence of

Mr. Milne's guilt was otherwise overwhelming. We agree with the government: the

testimony likely had little effect on the jury's verdict so any error in admitting the heroin

possession is harmless when placed in context and would not warrant reversal. Fed. R.

Crim. P. 52.

C.      Sufficiency of the Evidence

We review a denial of a motion for judgment of acquittal by evaluating the

evidence on the record as a whole, but we only review the evidence at the time the

defendant's motion was made if the court reserves ruling on the motion. United States v.

Delgado-Uribe, 363 F.3d 1077, 1082 (10th Cir. 2004). Accordingly, we review Mr.

Milne's challenge as to the proof of knowledge by evaluating the record as a whole, but

we review Mr. Milne's challenge as to the drug-quantity evidence only by evaluating the

government's evidence.[8] We review all of the evidence (direct and circumstantial) in the

light most favorable to the government to determine whether a reasonable trier of fact

could find guilt beyond a reasonable doubt. United States v. Rufai, 732 F.3d 1175, 1188

(10th Cir. 2013).

---

[8] The government notes that our review of this latter challenge is actually for plain error, as Mr. Milne did not renew his motion on this issue. Because "review under the plain error standard . . . and a review of sufficiency of the evidence usually amount to largely the same exercise," United States v. Rufai, 732 F.3d 1175, 1189 (10th Cir. 2013) (quoting United States v. Duran, 133 F.3d 1324, 1335 n.9 (10th Cir. 1998)), such distinction does not affect our analysis.

16

Mr. Milne argues that no reasonable jury could have concluded either that he knew the burlap sacks contained marijuana or that every bundle contained marijuana, and thus that the court should have sentenced him pursuant to his possession only of the one tested bundle. We agree that the government's sampling allowed the jury to hear direct evidence only as to the contents of one of the bundles recovered from Mr. Milne's vehicle. But we do not require proof by direct evidence as to every item of contraband. The district court instructed the jury to consider direct and circumstantial evidence equally, and to draw reasonable inferences from such evidence. 1 R. 180. Here, the jury heard enough circumstantial evidence that proved Mr. Milne knowingly committed both crimes. Although we might question why the government sampled only from one bundle initially,[9] the jury heard circumstantial evidence supporting the conclusion that all bundles in fact contained marijuana, and that Mr. Milne knew they contained marijuana. This evidence included Mr. Milne's words and conduct during his conversation with Agent Defayette, the similar appearance of all the bundles, agents' testimony that Mr. Milne's vehicle smelled like marijuana, and Mr. Pavón's testimony. Particularly because our standard of review requires us to view the evidence in the light most favorable to the

---

[9] The government offers many examples in which this court has held that sampling — some of which was as low as 1% of the total seized substances — sufficiently proved that all seized substances consisted of illegal narcotics. Aplee. Br. at 44–45. Mr. Milne is correct to criticize the government for failing to conduct a <u>random</u> sample. Aplt. Br. at 49–50. Nevertheless, our circuit does not require such random sampling; rather, it has held that the "government must establish that a sampling technique used to determine the existence and quantity of drugs is <u>reasonably</u> reliable." <u>United States v. Garner</u>, 223 F. App'x 792, 795 (10th Cir. 2007) (unpublished) (emphasis added). That the government only sampled one bundle speaks only to the weight of the evidence.

prevailing party and consider all evidence, direct and circumstantial, we hold that there was ample evidence supporting the jury's conclusion, and the district court's denial of Mr. Milne's motions for acquittal and its sentence that accounted for his possession of over 100 kilograms of marijuana must be upheld.

D.     Obstruction of Justice Enhancement

We review the facts underlying an obstruction of justice enhancement for clear error; legal conclusions concerning the Sentencing Guidelines are reviewed de novo. United States v. Hawthorne, 316 F.3d 1140, 1145 (10th Cir. 2003).

Mr. Milne argues that the district court erred by increasing his sentence solely because it found him to be not credible. Section 3C1.1 of the Sentencing Guidelines permits a district court to increase an offense level by two levels if it finds that "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction." U.S.S.G. § 3C1.1 (2014). A finding of perjury is sufficient to trigger this guideline enhancement. United States v. Rodebaugh, 798 F.3d 1281, 1300 (10th Cir. 2015). A defendant perjures himself when he (1) gives false testimony under oath; (2) about a material matter; and (3) his false testimony was willful. Id.

Mr. Milne argues that the district court erred by not specifying what portions of his testimony were not truthful. Aplt. Br. at 54. This court requires that sentencing courts "be explicit about which representations by the defendant constitute perjury." Hawthorne, 316 F.3d at 1146. But a sentencing court is not required to "specifically

18

identify" the perjurious statements, so long as it identifies the statements "at least in substance." United States v. Massey, 48 F.3d 1560, 1573 (10th Cir. 1995).

That said, the district court specifically identified many of Mr. Milne's statements, including his desire to find work in Rodeo, his belief that the bales were animal feed, and that he did not know Mr. Pavón was an illegal alien. 4 R. 526. In light of this circuit's requirements for a § 3C1.1 enhancement for obstruction of justice, the district court went "above and beyond in identifying the portions of Milne's trial testimony upon which it based the obstruction enhancement." Aplee. Br. at 50. The district court's obstruction of justice enhancement must be upheld.

AFFIRMED.

Entered for the Court

Paul J. Kelly, Jr.
Circuit Judge